[No. 21896. Department Two. December 16, 1929.]

JUANITA V. PECK *et al.*, *Appellants*, v. D. L. DAVIES *et al.*, *Respondents.*[1]

*Louis E. Shela,* for appellants.

*Van Dyke & Thomas* and *Clarence L. Gere,* for respondents.

FULLERTON, J.—In this action, the appellant, in her individual right and in her right as executrix of the estate of S. R. Peck, deceased, sought to recover from

[1]Reported in 283 Pac. 173.

the respondents upon a written contract. The record presents the facts somewhat meagerly, but the following are gathered therefrom. For some years prior to May 10, 1920, the Pacific Optical Company, a corporation organized under the laws of the state of Washington, owned and conducted an optical business in the city of Seattle. The Davies Optical Company, a corporation organized under the laws of the state of Oregon, was engaged in a like business at the city of Portland. The latter company had branch organizations at various places in the Pacific coast states, one of which was at Seattle. On the date given, the Davies Optical Company purchased and took over the property of the Pacific Optical Company. At that time, S. R. Peck and the appellant Juanita V. Peck were husband and wife, and owned all of the capital stock of the Pacific Optical Company. As a consideration for the purchase, the Davies Optical Company issued to S. R. Peck 35 21/100 shares of its capital stock, and agreed to pay to S. R. Peck the sum of $350 per month for the remainder of his natural life; and further agreed, in the case he should die prior to the death of Juanita V. Peck, to continue the payments to Mrs. Peck for the remainder of her natural life; the promise being subject to the condition that the capital stock transferred remained in the ownership of the husband or wife.

S. R. Peck died June 24, 1923, leaving Juanita V. Peck as his sole beneficiary. S. R. Peck owned and held the stock in the Davies Optical Company until his death, and since that time Juanita V. Peck has owned and held it. The monthly payments agreed to be paid by the terms of the contract were paid to S. R. Peck from the time of the execution of the contract until his death. Subsequently, they were paid to Juanita V. Peck up to and including the month of December, 1926.

At the time of the last payment, negotiations were pending for a sale of the assets and business of the Davies Optical Company to a concern known as the Riggs Optical Company. The sale was consummated early in the following year, since which time the Davies Optical Company has not operated as a going concern, and is insolvent. Subsequent to the payment made for December, 1926, no payments have been made on the original contract of purchase.

At the time of the purchase of the property of the Pacific Optical Company by the Davies Optical Company, and from that time to the time of its sale to the Riggs Optical Company, D. L. Davies and D. M. Davies were the principal stockholders of the Davies Optical Company, and were the officers thereof having its management and control. At the time of the sale, they entered into the following agreement with S. R. Peck:

"This Agreement, made between S. R. Peck of Seattle, Washington, party of the first part, and D. M. Davies and D. L. Davies, both of Portland, Oregon, parties of the second part:

"Witnesseth:

"Whereas, the party of the first part has sold to the Davies Optical Company, an Oregon corporation, a one half interest in the Pacific Optical Company, a Washington corporation, in which company the party of the first part and his wife own all the capital stock, and the said Davies Optical Company has succeeded to all the business of the said Pacific Optical Company, and

"Whereas, as part of the consideration of said sale the said Davies Optical Company has issued to the said party of the first part 35-31/100 shares of stock in said Davies Optical Company of the par value of one hundred dollars ($100), and as a part of the consideration has agreed that the said party of the first part and/or his wife, Juanita V. Peck, shall receive the sum of not less than three hundred fifty dollars ($350) per month

as dividends on their stock in the said Davies Optical Company as long as either of them shall live; and

"Now, Therefore, It is agreed: That the said party of the first part shall be paid by the Davies Optical Company the sum of three hundred fifty and no/100 dollars ($350) per month so long as he shall live and in case of his death before the death of his wife, Juanita V. Peck, then the said wife shall be paid said monthly sum so long as she shall live, but all payments so made to the said party of the first part and his wife shall be charged against the dividends declared upon the.................shares of stock so held by him in said company, and shall only be paid so long as said stock shall be owned by him and/or his wife, and the said parties of the second part hereby guarantee the faithful performance of said agreement and bind themselves, their executors, administrators, heirs, successors and assigns for the payment of said monthly sum.

"In Witness Whereof, the parties hereto have hereunto set their hands and seals this 10th day of May, 1920 A. D.

```
"Witness:            (Signed) S. R. Peck (Seal)
  "J. A. Swalwell              D. M. Davies (Seal)
  "F. I. Gill.                 D. L. Davies (Seal)."
```

The present action is founded upon the agreement quoted. In her complaint, the appellant set forth the agreement in substance, set forth the payments that had been made thereon, and alleged that there was then due and unpaid the sum of $4,200; that the contract then had a present worth of $36,876; and demanded a judgment in the sum of $41,076. The appellant named as parties defendant D. L. Davies, Sadie B. Davies, his wife, and D. M. Davies. D. M. Davies was not served with process, and D. L. Davies and his wife alone defended. In their answer, after making certain denials, they set up four affirmative defenses. In the first defense, they alleged that the contract set out "is and was illegal, without consideration, and void under the laws of the state of Washington." In the second

defense, they alleged that the agreement "was and is in violation of Article XII, § 6, of the constitution of the state of Washington, and also in violation of" a cited provision of the general statutes. The third and fourth defenses set forth matters tending to show that the appellant had parted with her interests in the subject-matter of the action, but, as the defenses were abandoned at the trial, they require no further consideration. The trial resulted in a judgment dismissing the action.

The record does not disclose the grounds upon which the trial court rested its judgment, further than these grounds may be reflected in the arguments of counsel. The arguments imply that it held that the contract of sale and the contract sued upon fell within the ban of constitution and statute referred to in the defendants' second affirmative defense. The constitutional provision therein cited reads as follows:

"Corporations shall not issue stock, except to bona fide subscribers therefor, or their assignees; nor shall any corporation issue any bond or other obligation for the payment of money, except for money or property received or labor done. The stock of corporations shall not be increased, except in pursuance of a general law, nor shall any law authorize the increase of stock, without the consent of the person or persons holding the larger amount in value of the stock, nor without due notice of the proposed increase having been previously given in such manner as may be prescribed by law. All fictitious increase of stock or indebtedness shall be void."

The statute to which reference is therein made is found at § 3823, of Remington's Compiled Statutes, and, in so far as it is material here, reads as follows:

"It shall not be lawful for the trustees to make any dividend except from the net profits arising from the business of the corporation, nor divide, withdraw, or

in any way pay to the stockholders, or any of them, any part of the capital stock of the company, nor to reduce the capital stock of the company unless in the manner prescribed in this chapter, or the articles of incorporation or by-laws, . . . "

Noticing first the constitutional provision, it is difficult to see wherein it can have application to the transaction here involved. The prohibition therein contained, it will be observed, is against the issuance of stock to any person except a bona fide subscriber therefor, and against the issuance of any bond or other obligation for the payment of money, except for money or property received or labor done; declaring all fictitious increases of stock or indebtedness to be void. It does not prohibit one corporation from buying the property of another, or prohibit it from entering into a binding obligation to pay for the property so purchased. It is at once apparent, therefore, that the purchasing corporation did not in this instance issue an obligation for the payment of money without property received, and equally apparent that the obligation created was not fictitious. The only part of the clause that can even remotely be applicable is the clause prohibiting the issuance of stock to others than bona fide subscribers.

But whether the person to whom the stock was issued was a bona fide subscriber or not, the record is silent. There is no showing one way or the other on the matter. Under these circumstances, regularity will be presumed, especially so where a contrary presumption might have the effect of allowing the corporation to escape the payment of a just obligation. But what we here say with reference to this question is in answer to the contention of the respondents. The more conclusive answer is, we think, that, even if the transfer of the stock could be said to be illegal for the reason

suggested, it would in no way avoid the promise of the corporation to pay the additional consideration it agreed to pay for the property it purchased.

■ The contention that the contract violated the statute quoted is also, we think, without foundation. To maintain the contention the respondents rely upon the case of *Jorguson v. Apex Gold Mines Co.,* 74 Wash. 243, 133 Pac. 465, 46 L. R. A. (N. S.) 637, and our kindred cases holding to the same effect. In the cited case, the plaintiff purchased stock in the defendant corporation to the amount of $1,000, and the corporation executed and delivered to him a bond conditioned that the corporation would, within eighteen months, pay to him $1,000 in cash as dividends upon the stock. The corporation, during the period, earned no dividends, and no payments were made in accordance with the conditions of the bond. The action was upon the bond, and it was held that there could be no recovery, because the contract was against public policy as evidenced by the statute. But it is at once apparent that there is a wide difference between the situation presented in the cited case and the situation presented in the case now before us. In the cited case, the promise was made to induce a purchase of the stock, and had no other consideration. There was not even an agreement that the stock should be returned in the case there were no dividends and the corporation should repay the money from its other resources. As was said in the opinion, the payment back to the purchaser of the money he paid for the stock would be to permit him to retain the stock as fully paid, leaving the issuance of the stock unsupported by any consideration whatsoever.

In the case before us, the promise to pay the money consideration was not made to induce a sale of stock. It rested on an entirely different consideration. The

corporation making the promise had purchased the property of another corporation, and took to itself the property. It paid for the property in part by issuing to the representative of the seller certain of its shares of stock, and agreed to pay the remaining part of the consideration in money, payable at stated intervals. The agreement to pay the money consideration was thus independent of the transfer of the stock, and rested upon a valuable consideration wholly independent of the transfer.

It is true that the contract recites that the money consideration shall be paid "as dividends on their stock," and it is on this recital that the respondents seize to support the contention that the contract is illegal. But it is inconceivable to us how the recital can have such an effect. It is not contended that the agreement is in any other respect illegal, nor is it contended that, had these words been omitted from the contract, there would not have been a valid and subsisting obligation. Nor do we think any such contentions can be successfully made. The validity of a contract must be determined from its subject-matter and from its provisions as a whole, and when the contract before us is so considered, it is at once apparent that the money consideration was agreed to be paid as a part consideration for the property sold and delivered to the promisor, and that its validity must rest upon this fact, and not upon any recital it may contain contradictory of its obvious purpose, and contrary to the actual fact.

The others of our cases to which we have made reference need not be specially noticed. They rest upon the principle of the cited case, and, as we view them, in no way affect the principle here involved.

Since the contract made by the principal is valid, so likewise is the contract of the respondents sued upon

valid. It may be debatable whether it is a contract of guaranty or an independent promise to pay. But, since the purchaser is insolvent and cannot be made to respond to a judgment, it is not necessary to determine the question, as the respondents are liable whichever view may be taken of the legal effect of their agreement in this respect.

The question of the amount the appellant is entitled to recover, that is, whether she may recover, in addition to installment payments due, the present worth of the contract based on her life expectancy, was not determined by the trial court and is not discussed in the arguments. The question is an important one, not free from difficulties, and we shall submit it for the primary determination of the trial court.

The judgment of the trial court is reversed, and the cause is remanded for further proceedings, not inconsistent with the views we have expressed.

MITCHELL, C. J., FRENCH, MAIN, and HOLCOMB, JJ., concur.