389 P.2d 196

**Katherine McMillen WOODSON and Sheila Rodey Faust, Plaintiffs-Appellees,**

**v.**

**Floyd W. LEE and Fernandez Company, a corporation, Defendants-Appellants.**

**No. 7277.**

Supreme Court of New Mexico.

Oct. 14, 1963.

Rehearing Denied Feb. 27, 1964.

Modrall, Seymour, Sperling, Roehl & Harris, Marron & Houk, Albuquerque, for appellants.

Rodey, Dickason, Sloan, Akin & Robb, William C. Briggs, Albuquerque, for appellees.

MOISE, Justice.

Plaintiffs brought suit herein to collect from defendants a pro rata share of $257,-334.90 of mineral income received by defendant Fernandez Company between 1939 and 1959, and claimed by plaintiffs to be due them under an agreement denominated a "Certificate of Participation" dated June 16, 1939.

It appears that in 1937 the Fernandez Company was a ranching corporation with 500,000 shares of stock of a par value of $1.00 issued, outstanding, and fully paid. In that year defendant Lee purchased 189,-824 shares from the heirs of A. B. McMillen, except plaintiff Katherine McMillen Woodson, being all the stock owned by them, at a price of 15¢ per share. The endorsements of the stock to defendant Lee stated that the same were made and accepted subject to a reservation of "one-half (½) of the earnings from oil, if any, for a period of

ten (10) years" from July 19, 1937, to be received by the respective grantors.

In the year 1939 a loan was negotiated by the corporation with Great Southern Life Insurance Company, out of the proceeds of which the 287,965 shares of common stock in the defendant corporation not owned by defendant Lee were purchased by the corporation for $45,429.83, or approximately 15.8¢ per share, and 66,000 shares of preferred stock were retired at par. As a condition of the making of the loan, a requirement was made by the insurance company that the entire 500,000 shares of stock in the corporation free from reservations or encumbrances of any kind be pledged as security. Accordingly, it was necessary that the 10-year reservation of "one-half the earnings from oil" agreed upon in 1937 be eliminated. This was agreed to by the owners of the reserved interest in consideration of the execution of a certificate of participation in which the other stockholders also joined and participated. The instrument was dated June 16, 1939. The important provision of this agreement, and the one giving rise to this litigation is section 3 which reads as follows:

"That Floyd W. Lee and Fernandez Company agree with the parties to this instrument, and each of them, that all income which may be received by Fernandez Company from the date of this instrument, until twelve o'clock noon, on June 16, 1959, from production, extraction leases, rentals and/or royalties from oil, gas and petroleum and for other minerals on the lands of the Fernandez Company, now owned by it in fee, and which income shall not be required by the holder of any mortgage or lien on said real estate to be applied to the payment and liquidation of such mortgage or lien, *and which income shall be for distribution to the stockholders of the corporation,* shall be by the said Floyd W. Lee and Fernandez Company distributed upon the following basis, to-wit:

| | |
|---|---|
| To Mrs. Florence McMillen, her heirs and assigns | 56,947/500,000 |
| To Mrs. May J. Koshland, her heirs and assigns | 62,500/500,000 |
| To Mrs. Louise J. Chadbourne, her heirs and assigns | 62,500/500,000 |
| To Eileen McMillen Lee, her heirs and assigns | 18,983/500,000 |
| To Pearce C. Rodey, individually and as guardian of the estates of Alonzo Bertram Rodey and Sheila Katherine Rodey, minor children of Dorothy McMillen Rodey, deceased | 18,983/500,000 |
| To Katherine McMillen Woodson, her heirs and assigns | 37,965/500,000 |

To Floyd W. Lee and to Fernandez Company the balance of such sums so to be distributed from the source and particular income hereinabove specified, in proportion to their holdings of stock."

During the 20-year period that the participating agreement remained in effect the corporation received $258,702.36 of oil and mineral income. During this same period, with the exception hereinafter noted, the corporation followed a uniform and consistent method of keeping its books and preparing its annual statement, being the same as that in effect for several years prior to 1939. According to the financial statements of the company, the capital account was impaired during each and every one of the years from 1938 to 1958, excepting only the years of 1950, 1956, 1957 and 1958. No dividends were paid by the corporation during the period. At the end of 1958 the books disclose $40,218.65 capital surplus. In 1959 it appears that $1367.46 was collected from mineral leases, making a total of $41,586.11 which defendants admit was available at the end of the period for making payments under the agreement.

Plaintiffs are two of those entitled to share under the participation agreement. They contend that under the language of the agreement they should be adjudged their pro rata share of the entire mineral income received by the corporation, amounting to $258,702.36. The trial court agreed with this position and entered judgment on behalf of plaintiffs in the amount of $29,440.32, being 11.38% of $258,702.36, mineral income received by the corporation during the 20-year period from June 16, 1939 to June 16, 1959.

From this judgment defendants appeal. They concede that at the time of trial and now plaintiffs are entitled to $4740.81, being approximately 11.38% of $41,586.11, noted above.

The problem presented requires that we determine the meaning of the provision in the participation agreement in which the defendants agreed to distribute to the parties named therein, including plaintiffs in the percentages therein provided, the income from "production, extraction, leases, rentals and/or royalties from oil, gas and petroleum and for other minerals * * * and which income shall not be required by the holder of any mortgage or lien * * * to be applied to the payment and liquidation of such mortgage or lien, *and which income shall be for distribution to the stockholders of the corporation. * * *"*

It is agreed that $258,702.36 was received by the corporation from oil and mineral leases and rentals during the twenty years that the participation agreement was in effect. It is also agreed that no part of this amount was required to be applied to the payment and liquidation of the mortgage or lien on the property and that the same has been paid in full. Plaintiffs contend that the money was accordingly income available for distribution to them, and that they are entitled to the same.

It is the position of defendants that income which is "for distribution to the stock-

holders" of a corporation is a dividend, and that under § 51–3–17, N.M.S.A.1953, distribution of any of these funds was prohibited so long as there was a capital deficit.

The plaintiffs contend, on the other hand, that the parties intended that if not required for mortgage payments the mineral income was to be distributed to the parties of the agreement; that the same was a part of the purchase price of the stock; that it could not have been the intention of the selling stockholders, after having sold their stock for 15¢ and having absorbed their loss on the stock, that they should agree that the capital deficit should be made up before they would receive anything from the minerals; and further, that having disposed of their stock they were no longer stockholders and there would be no reason to consider any amounts to be paid to them as dividends and, accordingly, such a result could not have been the intention of the parties. To support their position plaintiffs offered and the court received, over the timely objection of defendants, the testimony of W. A. Keleher, one of the attorneys who participated in the negotiation of the agreement.

Having studied the entire participation agreement and the part of paragraph 3 causing the difficulty, we are of the opinion that the defendants' position is well taken. We do not consider the language used to be in any sense ambiguous. Funds which "shall be for distribution to the stockhold-

ers" constitute a "dividend" and the distribution of dividends is prohibited by § 51–3–17, N.M.S.A.1953, "except from the surplus or net profits arising from" a corporation's business.

In 11 Fletcher, Cyclopedia of the Law of Private Corporations, § 5318, we find the following definition of "dividends":

> "The object of modern business corporations is to earn money for their stockholders or members. When such a corporation earns profits over and above the amount of its capital, the stockholders or members have the right, subject to qualifications which will be shown in the following sections, to have such profits set apart from the general mass of the funds of the corporation, and distributed among them in proportion to their shares or interest in the corporation, and the fund set apart for this purpose is called a 'dividend.' * * *"

See Booth v. Gross, Kelly & Co., 30 N.M. 465, 238 P. 829, 41 A.L.R. 868, defining "dividend" and holding that an agreement to pay the "equivalent of the regular dividend" on stock did not include "stock dividends."

Any agreement to distribute funds or assets of a corporation to stockholders regardless of surplus or net profit would be in violation of § 51–3–17, N.M.S.A.1953, and accordingly void. Cartwright v. Al-

buquerque Hotel Co., Inc., 36 N.M. 189, 11 P.2d 261. However, in the instant case there was no agreement to so distribute. The contract provided that plaintiffs should receive a distribution only when "income shall be for distribution to the stockholders," or in other words, when available as "dividends" and this could occur only when surplus or net profits were present. The language is not ambiguous and accordingly is binding and conclusive. Fuller v. Crocker, 44 N.M. 499, 105 P.2d 472. This is the contract the parties made for themselves, and we cannot consider their argument that because of the manner in which it operated they should be held not to have intended the natural consequences of their own words. It is not our province to change the agreement made by the parties by construction. Davis v. Merrick, 66 N.M. 226, 345 P.2d 1042.

That parol evidence was inadmissible to show an intention contrary to that clearly expressed in the writing is so universally recognized, citation of authority for the rule is not required. Hoge v. Farmers Market and Supply Company, 61 N.M. 138, 296 P.2d 476. In addition, the intention of the parties as attempted to be explained by the parol evidence and as found by the court makes the language here being examined mere surplusage, and requires that it be in effect disregarded. Generally, where there is no ambiguity present, words used by the parties will not be disregarded. The court should not, in the name of interpretation, eliminate from the contract any meaningful language used by the parties. George H. Buckler Co. v. Hood River County, 218 Or. 293, 341 P.2d 555; Ephraim Theatre Company v. Hawk, 7 Utah 2d 163, 321 P.2d 221.

Plaintiffs place great reliance upon the holding in the case of Peck v. Davies, 154 Wash. 559, 283 P. 173. In that case, Davies Optical Company purchased Pacific Optical Co. from S. R. Peck and wife and, as part of the purchase price, agreed to pay S. R. Peck $350.00 per month during his lifetime and, if he died before his wife, the same amount to her during her lifetime, the payments so made to "be charged against the dividends declared" on the Davies Optical Co. stock held by the Pecks. Upon payments being discontinued and suit therefor being instituted, it was contended that the contract was in violation of a statute comparable to our § 51–3–17, N.M.S.A.1953. The court held that the obvious purpose of the contract being to provide consideration for the stock being purchased, the payment was to be made as part of the purchase price, not as dividends. It seems to us that whereas in Peck v. Davies the payment of $350.00 per month was a firm obligation to pay, with the amounts received to be charged against dividends, if any, it was clear that the payment was part of the purchase price, and the provision for charging against dividends merely assured that in

addition to the monthly payment, no additional amounts were to be paid as dividends on the stock. Our situation is different. There is no firm obligation to pay whether or not there are funds available "for distribution to the stockholders" or as dividends. We think the cases are distinguishable on their facts, and out of the difference in the language of the contract and situation of the parties comes a different result.

Having determined that the contract provided for payment only out of moneys available for distribution as dividends, we still must consider plaintiff's contention that although the balance sheet showed generally that the capital account was impaired, in fact this was not true, as disclosed by financial statements furnished by defendant corporation in connection with certain loan applications. Unquestionably, over the years the property of the corporation has increased in value and the defendant corporation has made statements showing sizeable excess of value of its assets over its liabilities.

The questions involved are these: (1) should book value or market value be utilized in determining whether funds were available for distribution to the stockholders; (2) should a different method of accounting from that adopted and uniformly followed by the corporation be applied in determining the question; (3) should the capital stock of the company be reduced by the amount of stock held in the treasury; and (4) should treasury stock be treated as an asset or as a deduction from capital in the annual statements of the corporation?

That assets of the corporation should not be appreciated in value until sold is generally held, except in New York and except where statutes otherwise authorize. We quote from 11 Fletcher, Cyclopedia of the Law of Private Corporations, § 5335.1:

"It has generally been held except in New York that the unrealized appreciation in value of fixed assets in the writing up or revaluing of fixed assets cannot be counted in the computation of a surplus as a basis for cash or property or property dividends and in many states statutes have expressly excluded unrealized appreciation in value in computing the funds available for dividends. Some states permit share dividends from such appreciation, while others prohibit even such dividends."

§ 5345 reads, in part, as follows:

"The general rule seems to be that an increase in the value of lands held by the corporation cannot be considered as profits, at least until such lands are sold and the profits actually realized. * * *"

See also 55 A.L.R. 8, 32, to the same effect.

The New York rule, announced in Randall v. Bailey, 288 N.Y. 280, 43 N.E.2d 43, which permitted revaluation of assets of a corporation to arrive at surplus out of which

dividends could be paid, was reached because of the language of the New York statute which is materially different from our own, and because of the legislative history of changes made in the law.

■ On the question of whether a different method of accounting from that in use over the years should be applied in determining the availability of surplus, we come to the same conclusion as we did with reference to revaluing of assets, and generally for the same reasons. The procedures uniformly followed by defendant corporation were those in effect at the time of the purchase and sale of the stock, and for several years prior thereto. The accounting methods were acceptable to the taxing authorities, and there is no suggestion that there was any fraud or absence of good faith on the part of defendants in their accounting practice followed. To agree with plaintiffs' arguments would be to open the door to exactly what was intended to be prevented by § 51–3–17, N.M.S.A.1953. Through adoption of different accounting methods from those used over the years, it would be just as easy to create a profit or surplus as by a revaluation of assets, and neither is to be condoned. What we have said is true whether or not the accounting method in use is described as being in accord with "generally accepted accounting principles." Plaintiffs assert that the accounting practice followed did not meet this test, and that we should apply this standard in determining whether or not a surplus was present. For the reasons stated, under the facts of the instant case, we do not agree. ·

Also presented is the question of whether or not the stock purchased as treasury stock by the corporation should have been retired, and the capital account thereby reduced. If this had been done, the capital deficits would have been sooner eliminated and the statutory objection to payment of dividends overcome at an earlier date, and more of the money received from oil and mineral rentals and leases would have become available "for distribution to the stockholders of the corporation."

■ Whether or not stock purchased by the corporation is to be retired or carried as treasury stock is held by the majority of courts to depend upon the intention with which the purchase was made. Covey v. Covey's Little America, Inc., (Wyo.1963) 378 P.2d 506. The rule is stated thus in 11 Fletcher, Cyclopedia of the Law of Private Corporations (Perm.Ed.), § 5148:

"It is the majority rule that the purchase or acquisition of its own shares by the corporation is not in itself a reduction of the capital stock but that whether or not it has that effect depends on the circumstances and intent with which the shares are acquired."

That it was not intended that the stock should be retired, but that same was to be

continued as treasury stock is clearly shown by the agreement, wherein it is stated that "the lending company has required * * * that Floyd Lee and the Fernandez Company shall pledge with the lending company the entire 500,000 shares of said capital stock as additional security, and that said stock shall be free of all conditions, limitations and reservations; * * *" and by the further provision whereby the right to pledge the entire 500,000 shares free of conditions, limitations or reservations is recognized.

That a corporation may purchase its own stock, keep it alive, and treat it as an asset on its books, we think is clear. § 51–3–18, N.M.S.A.1953; Pabst v. Goodrich, 133 Wis. 43, 113 N.W. 398; 6A Fletcher, Cyclopedia of the Law of Private Corporations 410, § 2859 (Perm. Ed.).

▆ Prior to 1949 the stock acquired by the corporation was shown on its books as an asset. The annual balance sheet showed "287,965 shares of common stock of the company held in the Treasury, at cost, . . . $45,429.83." Commencing in 1949 and uniformly thereafter, this item was no longer shown, but instead, under a heading of "Capital and Retained Earnings" under "Liabilities," there was shown the entire 500,000 shares of capital stock at par, or $500,000, to which retained earnings would be added, or operating deficits deducted, and also, each year there would be deducted $45,429.83 representing the treasury stock at cost.

It is easy to see that absent this change in the method of handling the treasury stock in the company statement, the company would show $45,429.83 more assets than it did after 1949, and that this would result in the capital account being increased by a like amount. We do not pretend to say which way of accounting for the treasury stock was correct or proper from a bookkeeping standpoint. See Borg v. International Silver Co. (C.C.A.2, 1925) 11 F.2d 147; Katz, Introduction to Accounting 169, § 115. However, when corporate funds are expended to purchase stock of the corporation, and the change in bookkeeping methods affects plaintiffs, as interested parties, adversely, we are of the opinion that it should not be allowed. It follows that the amount available for distribution to the stockholders, admitted by defendants to be $41,586.11, should be increased by $45,429.-83, arrived at by the simple expedient of returning to the method of accounting for the treasury stock followed prior to 1949.

In our discussion of this problem we have not overlooked the fact that in financial statements made by the corporation during the period in question, the treasury stock was not shown to be in existence. The fact remains that it had never been retired nor, as already noted, did the parties contemplate that it would be when the participa-

tion agreement was entered into. Accordingly, it is only proper that it be treated as outstanding treasury stock, and be accounted for as an asset of the corporation, as indeed it is.

We note one additional item. The trial court made findings concerning extensive expenditures by defendants as capital improvements, and concluded that "the books of account and records of the Fernandez Company, if prepared in accordance with generally accepted accounting principles, would show sufficient earned surplus at the end of 1958 to cover the entire amount of mineral income received by it since July 16, 1939, so that payment of such mineral income would not have created any impairment of the capital of that company." We have disposed of several questions concerning the methods of accounting for certain items. The court's findings do not point out how much effect there would have been on the balance sheet of the corporation if treatment of capital improvements had been different from that followed, and if the books had been "prepared in accordance with generally accepted accounting principles," and we do not find in the evidence anything that would support a finding as to the significance thereof. Accordingly, we do not consider these items as material so as to alter the conclusions otherwise reached by us.

It follows from what has been said that the judgment appealed from is reversed, and the cause remanded with instructions to enter judgment for plaintiffs in accord with what is herein said, each party to bear his or its own costs.

It is so ordered.

COMPTON, C. J., and CARMODY, J., concur.