[No. 57230-0-I. Division One. February 5, 2007.]

DAVID GREEN ET AL., *Plaintiffs*, WILLIAM M. EDLEMAN ET AL., *Appellants*, v. NORMANDY PARK RIVIERA SECTION COMMUNITY CLUB, INC., *Respondent*.

WILLIAM M. EDLEMAN ET AL., *Appellants*, v. NORMANDY PARK RIVIERA SECTION COMMUNITY CLUB, INC., *Respondent*.

SUE BENWAY ET AL., *Respondents*, v. WILLIAM M. EDLEMAN ET AL., *Appellants*.

*Peter J. Eglick* and *Joshua A. Whited* (of *Eglick Kiker Whited, PLLC*), for appellants.

*Robin A. Schachter* and *Jerry H. Kindinger* (of *Ryan Swanson & Cleveland, PLLC*), for respondents.

¶1 DWYER, J. — William and Kathie Edleman built a house in a Normandy Park neighborhood that does not comply with provisions of the neighborhood's restrictive covenants and without obtaining prior approval from the Normandy Park Riviera Section Community Club, Inc. (Community Club), the organization that enforces the covenants. The ensuing litigation led to the trial court's entry of judgment in favor of the Community Club and the Benways, neighbors of the Edlemans, and issuance of an injunction requiring complete demolition of the Edlemans' house and garage.

¶2 The Edlemans appeal, assigning error to the trial court's summary judgment ruling that the Community Club had the authority to enforce the restrictive covenants, to the trial court's conclusion that the Edlemans' construction must meet interior setback requirements as measured from the common boundary of the two lots upon which the house sits, and to several other findings and conclusions of the trial court. Because we agree that the Edlemans were entitled to build across their two lots without complying with interior setback requirements, we reverse the judgment and remand the matter to the trial court for a determination of the appropriate remedy in light of this decision. In all other respects, we affirm the decisions of the trial court.

## FACTS

### I. *Underlying Dispute*

¶3 In November 2000, the Edlemans purchased a house sitting on land in the neighborhood known as the Riviera

Section of the city of Normandy Park. The Edlemans made plans to demolish the existing house and to construct a new house on the land.

¶4 In January 2002, after construction plans had been drafted but before construction began, the Edlemans received a letter from the Community Club requesting that they conform their planned construction to the provisions of the neighborhood covenants.[1] The letter further stated that all construction in the neighborhood was subject to Community Club approval and requested that the Edlemans submit a site plan and preliminary building plan to the Community Club for review. Enclosed with the letter was a petition signed by several residents of the neighborhood, requesting that the Edlemans voluntarily comply with the covenants.

¶5 In February 2002, the Edlemans responded by letter to the Community Club, offering a "compromise" plan under which the Edlemans' house would span the two lots, be set back 15½ to 16 feet from the property line to the south of the southern lot, 8 feet from the property line to the north of the northern lot, and 20 feet from the street.[2] An attached diagram illustrated the house's proposed placement.

¶6 In March 2002, the Community Club responded by letter. The letter stated that the Edlemans' neighbors were opposed to the Edlemans building a home outside those

---

[1] The covenants ("Declaration of Reservations and Protective Restrictions") were recorded in 1929. The schedule attached to the covenants identify the Edlemans' land as two lots, #35 and #36, and state that any home constructed on either of the lots must be set back 45 feet from the street to the east, 7 feet from the lot line to the north, and 30 feet from the lot line to the south. Section 18 of the covenants provides that no more than one single-family dwelling shall be constructed on any lot's building site. Section 1 defines "building site" as that area within the setback lines on each lot. Section 23 states that no house or garage shall be erected on any of the lots in the neighborhood unless the plans and specifications are submitted to the neighborhood developer and the developer has approved those plans in writing. Section 19 provides that the developer has authority to grant "reasonable variations" from setback requirements.

[2] The Edlemans planned to demolish the existing house, also built across the boundary line between the two lots, in order to accommodate their planned new structures.

setbacks established by the covenants and requested that the Edlemans submit new plans in compliance with the setback requirements. Over the next few months, the Community Club sent several further letters to the Edlemans, requesting compliance with the covenants and submission of building plans to the Community Club.

¶7 The Edlemans demolished the existing house in late 2002 and commenced construction of their house and garage in early 2003, without submitting further proposed plans to the Community Club or obtaining Community Club approval.

¶8 In March 2004, the Edlemans sent the Community Club the plans for the house and garage then under construction. In April 2004, the Community Club replied to the Edlemans by letter disapproving of the planned construction.[3] The letter detailed the setback and consent-to-construct requirements of the covenants, as well as the steps taken and information reviewed by the Community Club in making its determination, and made specific recommendations for bringing the plans into compliance with the covenants.

¶9 The Edlemans continued with the construction as planned. To date, both the house and garage have been substantially completed. The structures span the Edlemans' two lots, with the house to the south and the garage to the north. The house sits on top of the boundary

---

[3] Specifically, the Community Club stated:

[T]he [Community Club] Board unanimously concludes it cannot approve your current construction plans. The Board unanimously concludes your proposed two structures together and your North Building in particular are not in harmony with the Riviera Section because they are drastically, materially and substantially different in size, width and length, square footage, design, preservation of open green space and set backs in comparison to all of the following: the previously existing . . . residence; the structures the [Community Club] has approved in the past; the existing character of the Rivera Section as a whole; and the common plan of the Covenants.

With a dwelling across the middle of two combined lots, the Board concludes it cannot approve your current construction plans with the size of your buildings so far outside the setback lines and without provision for open green space. The Board cannot permit a purchaser to buy adjacent lots in the Riviera Section and comply only with the outermost covenant setbacks.

line between the two lots and, thus, is not set back from that boundary line on either of the lots. The house complies with the covenants' setback requirement to the south, and the garage complies with the covenants' setback requirement to the north. However, the house and the garage both encroach onto the covenants' 45-foot street-side setback to varying degrees.[4]

## II. *Procedural History*

¶10 The present litigation is the result of three separate lawsuits that were eventually consolidated by the trial court.

¶11 In the first case, the Edlemans filed a complaint in April 2002 against the Community Club, seeking a judgment declaring that the Community Club lacks the right, standing, and authority to enforce the covenants.

¶12 In the second case, the Edlemans filed a complaint in October 2002 against the Community Club and neighbors of the Edlemans, the Cooks and the Fawcetts. The Edlemans again sought a judgment declaring that the Community Club lacks the right, standing, and authority to enforce the covenants. The Edlemans also sought either a declaration that the covenants have been abandoned or enforcement of the covenant restrictions against the Cooks and the Fawcetts, whose property the Edlemans alleged to be in violation of covenant provisions.

¶13 In the third case, the Benways, the Edlemans' neighbors to the south, filed a complaint in December 2002, seeking an injunction prohibiting the Edlemans from constructing a house outside the setback lines and without Community Club approval. The Benways immediately moved for a temporary restraining order prohibiting the Edlemans from commencing construction. The trial court denied the motion.

¶14 In May 2002, the Edlemans moved for summary judgment in the first case, arguing that the Community

---

[4] The front of the house encroaches four feet into the setback area at one point. The entire front of the garage encroaches 20 feet into the setback area.

Club is not a valid successor to the interests of the developer and, therefore, lacks the authority to enforce the covenants. The Edlemans did not argue that the Community Club lacks authority to enforce the covenants for any reason other than its successor status. The trial court denied the motion, noting that "it is a question of fact whether defendant is a successor with respect to the 1929 covenant."

¶15 In July 2003, the Community Club moved for summary judgment in the first case, arguing that the Community Club is a valid successor to the interests of the developer and, therefore, has the authority to enforce the covenants. The Edlemans responded to the motion, arguing that the Community Club is not a valid successor to the developer and, therefore, does not have the authority to enforce the covenants. As with their prior motion for summary judgment, the Edlemans did not argue in that response that the Community Club lacked authority to enforce the covenants for any reason other than its successor status.[5]

¶16 The trial court granted the Community Club's motion for summary judgment, ruling that: "[t]he defendant has the right, standing and authority to enforce covenants."

¶17 In February 2004, the Community Club moved to consolidate all three cases pursuant to CR 42(a).[6] The Edlemans responded, requesting that the trial court consolidate only the second and third cases. The Edlemans argued that the first case should not be included in the consolidation because the singular question in that case was whether the Community Club had the right, standing, and authority to enforce the covenants, and the summary

---

[5] While the Edlemans alleged in one of their pleadings in the first case ("Plaintiffs' Answer, Affirmative Defenses and Reservation of Rights to Defendant's Counterclaim for Declaratory Relief") that the board lacked authority to enforce the covenants because the board members had not been elected, that issue was not mentioned in the Edlemans' response to the Community Club's motion for summary judgment.

[6] CR 42(a) allows for the consolidation of cases involving a "common question of law or fact."

judgment ruling resolved all issues related to that question. After a hearing, the trial court granted the Community Club's motion to consolidate.

¶18 The consolidated cases proceeded to bench trial on August 2, 2004. During trial, the Edlemans sought to introduce evidence that the board of the Community Club was not elected, a circumstance potentially relevant to the issue of the board's authority to enforce the covenants. The Community Club objected based on the prior summary judgment ruling. The trial court ruled that the Edlemans had abandoned any issues regarding the board's authority to enforce the covenants by asserting to the court in a pleading that all issues relevant to the board's authority had been resolved by the summary judgment ruling rendered in the first case. Accordingly, the trial court held that evidence regarding how the board of the Community Club was constituted was admissible only for its potential relevance to the question of the reasonableness of the board's decision making, not to the board's authority to enforce the covenants.

¶19 The trial court entered judgment in favor of the Community Club and the Benways, ruling that the covenants were valid and enforceable against the Edlemans, that the Benways had standing to seek enforcement of the covenants, and that the Edlemans' house and garage were built in violation of the covenants both because the buildings were constructed outside the covenants' setback areas and because the Edlemans failed to obtain written approval of the Community Club prior to construction. Accordingly, the trial court issued a permanent injunction against the Edlemans requiring demolition of both the home and the detached garage and enjoining the Edlemans from constructing any further buildings on the land without first obtaining Community Club approval.[7]

---

[7] The trial court also entered judgment in favor of the Fawcetts, finding that the Edlemans had failed to show that they were aggrieved parties in relation to the Fawcetts' alleged violation of the covenants. The Cooks were no longer parties to the litigation at the time of the trial court's ruling.

¶20 The trial court also issued findings of fact and conclusions of law. Therein, the trial court found that the Community Club acted reasonably and in good faith in not approving the Edlemans' proposed construction, that the Edlemans are required to comply with the covenants' interior setback requirements between their two lots, that the covenants had not been abandoned and were, therefore, valid and enforceable against the Edlemans, and that the Edlemans were not entitled to a balancing of equities by the trial court in considering whether the house and garage should be removed.

¶21 In March 2005, the Edlemans filed a postjudgment motion asking the trial court to require the Community Club to process revised plans submitted by the Edlemans.[8] The trial court treated the Edlemans' motion as a motion to clarify the court's final orders. The trial court denied the motion.

## DISCUSSION

### I. Summary Judgment Ruling

#### A. Motion To Strike

¶22 Before we can address the merits of the order granting summary judgment, our first task is to resolve a motion referred to us by our commissioner. The Edlemans move to strike from the corrected brief of respondents references and citations to two documents. These documents are the affidavit of Susan Nelson-Benway and the supplemental declaration of Doyle Montgomery. Each of these documents was designated as part of the appellate record by the Community Club. However, neither is listed in the trial court's order granting summary judgment to the Community Club. Accordingly, the Edlemans' motion is well taken.

---

[8] In November 2004, the Edlemans submitted a revised set of plans to the Community Club and a letter requesting a meeting with the board. In January 2005, the Community Club responded, stating, "The Board will deal either with litigation or process your post-trial request for a variance, not both."

■ ¶23 The applicable rule is clear:

**RULE 9.12 SPECIAL RULE FOR ORDER ON SUMMARY JUDGMENT**

On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court. The order granting or denying the motion for summary judgment shall designate the documents and other evidence called to the attention of the trial court before the order on summary judgment was entered. Documents or other evidence called to the attention of the trial court but not designated in the order shall be made a part of the record by supplemental order of the trial court or by stipulation of counsel.

RAP 9.12. The companion rule is equally clear:

**RULE 9.13 REVIEW OF DECISION RELATING TO RECORD**

A party may object to a trial court decision relating to the record by motion in the appellate court.

RAP 9.13.

¶24 It is not difficult to discern the reason for the existence of these rules. It is the appellate court's task to review a ruling on a motion for summary judgment based solely on the record before the trial court. *Wash. Fed'n of State Employees, Council 28 v. Office of Fin. Mgmt.*, 121 Wn.2d 152, 163, 849 P.2d 1201 (1993); *Gaupholm v. Aurora Office Bldgs., Inc.*, 2 Wn. App. 256, 257, 467 P.2d 628 (1970). The purpose of RAP 9.12 "is to effectuate the rule that the appellate court engages in the same inquiry as the trial court." *Wash. Fed'n of State Employees*, 121 Wn.2d at 157.

¶25 A reality of modern trial practice is that not all documents filed with a county clerk's office make their way into the superior court file prior to the court file being given to the judge tasked with preparing for, and ruling upon, a dispositive motion. To deal with this phenomenon, our various superior courts have promulgated a plethora of local rules, including those requiring the provision of "working copies" of pleadings to the judge before whom the

motion is to be argued. However, measures such as this do little to clarify to a reviewing court the exact composition of the record before the superior court judge at the time the summary judgment ruling was rendered.

¶26 Thus, RAP 9.12 was promulgated. It is designed to make clear the composition of the record before the judge ruling on the motion. Its provisions are simple, easy to comply with, and mandatory.

¶27 Pursuant to RAP 9.12, there are three ways—and only three ways—for a document or evidentiary item to properly be made part of the record on review: (1) the document or evidentiary item may be designated in the "order granting or denying the motion for summary judgment," (2) the document or evidentiary item may be designated in a "supplemental order of the trial court," or (3) counsel for all parties may stipulate that the document or evidentiary item was "called to the attention of the trial court."

¶28 In this case, as in most cases in our trial courts, counsel for the prevailing party was afforded the opportunity to draft and present to the court the order granting summary judgment it wished the court to sign and enter. Thus, the Community Club is aggrieved—if it is aggrieved at all—as a direct result of actions it took in preparing and submitting to the court the order granting summary judgment ultimately entered by the court.

¶29 The order granting summary judgment does not designate either the affidavit of Susan Nelson-Benway or the supplemental declaration of Doyle Montgomery as having been called to the attention of the trial court during the summary judgment proceeding. Thus, in the absence of a stipulation of the parties or a supplemental order of the trial court, these evidentiary items are not properly part of the record on review. The Edlemans declined to enter into any such stipulation. This left the Community Club with the option of seeking entry of a supplemental order by the trial court. Twenty-seven months after the hearing on the motion for summary judgment, it did so.

¶30 In response, the trial court entered a written order denying the Community Club's request. In this order, the trial court recited that it had no independent memory as to whether these items had been called to its attention. Moreover, the hearing had not been reported or recorded. However, the trial court reviewed both its notes taken in preparation for the hearing and its notes taken during the hearing and was unable to discern any reference to the items. After diligent consideration, the trial court entered its written order denying the motion for a supplementary order.

¶31 At this point, the Community Club had two possible options: (1) acquiesce in the trial court's decision and brief and argue the case on appeal without reference to the two objectionable items or (2) bring a motion in this court, pursuant to RAP 9.13, seeking review of the trial court's order refusing to designate the two objected-to evidentiary items for inclusion in the record on review.

¶32 The Community Club chose a third course of action—complete defiance of the Rules of Appellate Procedure. Without the permission of either this court or the superior court, the Community Club designated the two items for inclusion in the Clerk's Papers. It then cited to the documents and argued from their content to this court in its briefing. This forced the Edlemans to bring this motion to strike.

¶33 Remarkably, the Community Club exacerbated the damage done by its defiance of our rules of procedure by filing a written response to the motion to strike, arguing, in essence, that the rules do not apply to it because the trial judge was wrong to deny its motion for a supplemental order. This explanation now meets the implacable gaze of the appellate court. The simple fact is that the Community Club did not seek to avail itself of the opportunity provided

by RAP 9.13, choosing instead to ignore the requirements of RAP 9.12. The Edlemans' motion to strike is granted.[9]

## B. The Community Club Is a Valid Successor to the Neighborhood Developer

¶34 The Edlemans first contend that the trial court erred by granting the Community Club's motion for summary judgment and ruling, thereby, that the Community Club had the right, standing, and authority to enforce the covenants. The Edlemans argue, in particular, that the neighborhood developer was the only party vested with the authority to enforce the covenants, and that the Community Club is not a valid successor to that developer. The Community Club argues, to the contrary, that it is the developer's proper successor and that it possesses the developer's right and authority to enforce the covenants.

¶35 We engage in a de novo review of a ruling granting summary judgment. *Anderson v. Weslo, Inc.*, 79 Wn. App. 829, 833, 906 P.2d 336 (1995). Thus, we engage in the same inquiry as the trial court. *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 698, 952 P.2d 590 (1998). Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law. CR 56(c); *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991). All reasonable inferences from the evidence must be construed in favor of the nonmoving party. *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979). The interpretation of language contained in a restrictive covenant is a question of law for the court. *Parry v. Hewitt*, 68 Wn. App. 664, 668, 847 P.2d 483 (1992).

---

[9] Unquestionably, the Edlemans incurred expense in bringing this matter to our attention. Thus, the Edlemans request for the imposition of monetary terms in their favor is granted. They may apply to our commissioner for a calculation of attorney fees reasonably incurred for efforts in this court, solely regarding this motion. Our commissioner will make the necessary award.

¶36 From the evidence that was properly before the trial court, we conclude that the trial court properly ruled that the Community Club is a valid successor to the developer, possessing the authority to administer and enforce the covenants' provisions.[10]

¶37 The covenants, recorded in 1929, require that building plans for any of the lots in the neighborhood be approved by the developer. The covenants further state that the provisions therein are intended to "be a covenant running with the land." In 1934, the developer's estate was sold to the Seattle Trust and Savings Bank in a foreclosure sale. In 1937, that estate was sold to the Normandy Park Company by quitclaim deed.

¶38 In 1947, the Normandy Park Company recorded a document entitled "Conveyance of Authority to Enforce Restrictions," which purported to convey all the Normandy Park Company's right, title, and interest in the covenants, as well as its right to enforce the covenants, to the recently incorporated Normandy Park, Riviera Section, Community Club, Inc. (NPRSCC),[11] and to its "successors or assigns." In 1977, the officers of that organization failed to file an annual report, and the organization was administratively dissolved by the secretary of state. The officers of the organization continued to hold meetings and take steps to enforce the covenants after the organization was dissolved.[12] In 1988, officers filed new articles of incorpora-

---

[10] Having determined that the affidavit of Susan Nelson-Benway and the supplemental declaration of Doyle Montgomery are not properly a part of the record on appeal, we do not rely on either document in our analysis of this issue.

[11] The NPRSCC in existence in 1947 was a different entity than the Community Club in existence today, though both entities were incorporated under the same name (Normandy Park Riviera Section Community Club, Inc.). To avoid confusion, we refer to the incorporated entity that existed between 1947 and 1977 as the NPRSCC in order to distinguish it from the Community Club incorporated in 1988 and presently in existence.

[12] Such steps included corresponding with individual homeowners regarding compliance with the covenants, requiring homeowners to submit construction plans, and approving or disapproving construction plans.

tion.[13] After incorporation, the organization continued to take steps to enforce the covenants.

¶39 The Edlemans first contend that, by the terms of the covenants, the authority to enforce the covenants was vested exclusively in the neighborhood developer and could not, therefore, be passed to subsequent owners of the developer's interests. We disagree.

¶40 Restrictive covenants are interpreted to give effect to the intention of the parties to the agreement incorporating the covenants and to carry out the purpose for which the covenants were created. *Riss v. Angel*, 131 Wn.2d 612, 621, 934 P.2d 669 (1997); RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 4.1 (2000). The purpose of those establishing the covenants is the relevant intent. *Riss*, 131 Wn.2d at 621. Subdivision covenants tend to enhance the efficient use of land and its value. The value of maintaining the character of the neighborhood in which the burdened land is located is a value shared by the owners of the other properties burdened by the same covenants. *Riss*, 131 Wn.2d at 622-24. Thus, we must place " 'special emphasis on arriving at an interpretation that protects the home-owners' collective interests.' " *Riss*, 131 Wn.2d at 623-24 (quoting *Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 61 Wn. App. 177, 181, 810 P.2d 27 (1991)). Accordingly, if more than one reasonable interpretation of the covenants is possible regarding an issue, we must favor that interpretation which avoids frustrating the reasonable expectations of those affected by the covenants' provisions.

¶41 Here, the covenants state that they are intended to "run with the land." This means that the benefit or burden created in the land passes automatically to succes-

---

[13] At least two of the three officers who signed the 1988 articles of incorporation were active in the organization before incorporation. At least one of the signing officers had been involved in the NPRSCC before its administrative dissolution.

sors to the benefited or burdened estates. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 5.1 cmt. a (2000).[14]

¶42 The covenants also provide that the developer possesses the authority to enforce the covenant provisions against the owners of the burdened lots. In other words, the developer retained the benefit of enforcement authority, and the purchasers of the lots are burdened by the requirement that they submit to the authority of the developer. However, the covenants themselves do not specifically state whether the benefit of the enforcement authority passes to the subsequent owners of the developer's interest.

¶43 If such authority did not pass to subsequent owners, however, the purposes of the covenants and the reasonable expectations of the lot owners would be frustrated. The lot-owners' estates are benefited by the existence of an entity with authority to enforce the covenants by requiring owners of the burdened lots to submit construction plans to that entity for approval. The benefit created by the covenants adds value to the lot-owners' land. *Riss*, 131 Wn.2d at 622-24. By the terms of the covenants, that benefit runs with the land and passes to subsequent purchasers of individual lots. The benefit would be compromised if the authority to administer and enforce the covenants terminated when the developer's existence ceased.

¶44 Accordingly, we interpret the provision in the covenants which states that the covenants run with the land to mean that the benefit of the developer's enforcement power properly passed to those companies who acquired the developer's estate, the Seattle Trust and Savings Bank in 1934 and the Normandy Park Company in 1937.[15]

---

[14] No specific instrument of transfer is necessary to pass servitude benefits and burdens to successors to the benefited or burdened property; they pass automatically. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 5.1 cmt. b (2000).

[15] Neither the *Restatement* nor any Washington cases set out general or default rules for determining succession to developer rights and obligations in the context of subdivisions such as the one here. The *Restatement* explains that the question of whether a party succeeds to a developer's rights must be determined on a case-by-case basis based on an interpretation of the document creating those rights and the facts of the particular case. RESTATEMENT (THIRD) OF PROPERTY:

¶45 The Edlemans next contend that the authority to enforce the covenants could not have validly passed to the present-day Community Club because any such authority was necessarily terminated by the NPRSCC's 1977 administrative dissolution. We disagree.

¶46 The conveyance of authority issued by the Normandy Park Company in 1947 clearly states its intent to assign its authority to the NPRSCC, and to its "successors or assigns." This conveyance was a valid means by which to pass authority. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 5.6(1) (2000) ("[T]he power to enforce servitudes created to implement a general plan of development may be transferred in whole or in part to an association whose membership is based on ownership of property included in the general plan.").[16]

¶47 The covenants do not define "successors or assigns." The Edlemans have not directed us to any authority which compels the result that the term may not include the unincorporated entity which continued to enforce the covenants between 1977 and 1988, or the subsequent incorporated entity which continues to enforce the covenants today. The Community Club, however, correctly notes that the South Carolina Supreme Court, in *Battery Homeowners Ass'n v. Lincoln Financial Resources, Inc.*, 309 S.C. 247, 422 S.E.2d 93 (1992), held that the phrase "successors" in covenants granting enforcement authority to a homeowners association and its "successor or assigns" included an unincorporated association of property owners formed after the

---

SERVITUDES § 5.1 cmt. c (2000). Employing this approach, cases from other jurisdictions have found succession to a developer's rights or obligations in the absence of an explicit provision, as we do here. *See, e.g., Lake Forest Prop. Owners' Ass'n v. Smith*, 571 So. 2d 1047, 1050 (Ala. 1990) (parent corporation with which developer corporation merged successor to developer's voting rights); *Sherwood Estates Homes Ass'n v. Schmidt*, 592 S.W.2d 244, 247-48 (Mo. Ct. App. 1979) (developer's assignment to homeowners association of right to enforce restrictions carried with it the right to grant or deny approval of plans for structures despite covenant language requiring approval by the developer, because assignment was consistent with the purpose of the development).

[16] The homeowners as a whole were the members of the NPRSCC as it was originally constituted and were authorized to vote to elect the NPRSCC's board members.

original association's administrative dissolution. In so holding, the court noted that "successor" is a term of art that may refer to successors of "corporate control," or simply to an entity that "'has in fact succeeded.'" *Battery Homeowners*, 309 S.C. at 250 (quoting *Bremner v. Alamitos Land Co.*, 11 Cal. App. 2d 150, 153, 53 P.2d 382 (1936)).

¶48 As with the covenants themselves, we favor the interpretation of the conveyance of authority that does not frustrate either the purpose of the covenants or the reasonable expectations of the lot owners of the Riviera Section neighborhood. Accordingly, we hold that the Edlemans, on this record, have not raised an issue of material fact preventing the conclusion that the Community Club as it exists today is a valid successor to the NPRSCC and its predecessors and, as such, has the authority to enforce the covenants against the Edlemans.

### C. Abandoned Issue May Not Be Raised on Appeal

¶49 In their appellate briefing, the Edlemans attack the manner in which the Community Club board was constituted. The Edlemans point out several disturbing aspects of the board's composition: (1) its initial members were self-appointed; (2) subsequent members have been appointed solely by existing members; (3) the board is in no way accountable to the property owners whose lots it regulates; (4) the only members of the Community Club are those people who sit on the board, lot ownership alone does not result in Community Club membership; and (5) critics of the Edlemans' building proposal were allowed to sit on the board.[17]

¶50 The question of "who may decide" is one pertaining to the authority of the decision maker. *See Heath v. Uraga*, 106 Wn. App. 506, 514, 24 P.3d 413 (2001). Only a properly nominated person may exercise the authority granted the decision maker by the covenants. *Heath*, 106 Wn. App. at 515. Thus, the Edlemans properly pleaded these concerns

---

[17] The Community Club is not a homeowners association as provided for by statute. *See* ch. 64.38 RCW.

in one of their pleadings in the first lawsuit, in which they sought a judgment declaring the Community Club to be without authority to administer and enforce the covenants.

¶51 For some reason, the Edlemans then abandoned this issue. In their pleadings in opposition to the summary judgment motion, the Edlemans never raised this issue. Nor did they raise the issue in their pleadings in support of their motion for summary judgment. Issues and contentions neither raised by the parties nor considered by the trial court when ruling on a motion for summary judgment may not be considered for the first time on appeal. *Ferrin v. Donnellefeld*, 74 Wn.2d 283, 285, 444 P.2d 701 (1968); *Concerned Coupeville Citizens v. Town of Coupeville*, 62 Wn. App. 408, 413, 814 P.2d 243 (1991); *Ashcraft v. Wallingford*, 17 Wn. App. 853, 860, 565 P.2d 1224 (1977).

¶52 The Edlemans' abandonment of this issue was apparently no accident. The issue was only pleaded by the Edlemans in the first lawsuit. The issue was neither raised nor discussed in opposition to the Community Club's motion for summary judgment in that lawsuit on the question of the Community Club's authority to administer and enforce the covenants. Moreover, after the summary judgment order was entered, the Edlemans did not appear for trial on the assigned trial date, indicating by that action their belief that there were no issues raised in their pleadings that remained for resolution on the trial date.[18]

¶53 During trial on the consolidated cases, the trial court ruled that the Edlemans had abandoned this issue. Following trial, the trial court entered finding of fact 9 to the same effect:

---

[18] Indeed, following questioning by this court at oral argument, the Edlemans submitted a statement of additional authority, citing *Olympic Fish Products, Inc. v. Lloyd*, 93 Wn.2d 596, 602, 611 P.2d 737 (1980), for the proposition that the purpose of summary judgment is to avoid a useless trial. The Edlemans' view that a trial was "useless" after entry of the summary judgment order is a further demonstration that they had abandoned their challenge to the authority of the Community Club predicated upon the manner in which the board was constituted.

At trial the Edlemans stated that issues relating to . . . whether the Board itself was properly formed remained to be litigated, such as whether the [Community Club] board was properly constituted and whether its actions were in violation of the requirements for a non-profit corporation. The defendants protested that this issue was not before the court and they were not prepared to litigate these issues. The only lawsuit in which [these] issues were raised was [the first case], where they were raised in "Plaintiff's Answer, Affirmative Defenses and Reservation of Rights to Defendants' Counterclaim for declaratory relief" which was signed on 10/17/02. In that lawsuit, the Edlemans filed pleadings with the Court in support of the Edlemans' efforts regarding consolidation of these cases, and in those pleadings represented that all claims raised in that lawsuit . . . were resolved by [the trial court's summary judgment] ruling. The defendants had a right to rely upon the statement of counsel as to the issues remaining to be tried. Therefore, the court finds that the Edlemans abandoned these issues.

¶54 The trial court's finding that this issue had been abandoned is supported by the record. First, as noted above, the issue was not raised in opposition to the summary judgment motion. Second, no trial was held on the first lawsuit, indicating that the summary judgment order resolved all claims in that case. Third, in their pleading objecting to consolidation, the Edlemans affirmatively stated that the summary judgment order resolved all issues pertaining to the Community Club's authority to act. Finally, the issue was not pleaded in any case other than the first lawsuit.

¶55 The trial court correctly ruled that this issue had been abandoned by the Edlemans. It is a long-standing rule that abandoned issues will not be addressed on appeal. RAP 2.5(a); *Peck v. Davies*, 154 Wash. 559, 563, 283 P. 173 (1929); *Gregory v. Peabody*, 138 Wash. 591, 597, 244 P. 998 (1926); *Buckeye Buggy Co. v. Montana Stables, Inc.*, 43 Wash. 49, 51, 85 P. 1077 (1906); *Soderberg Adver., Inc. v. Kent-Moore Corp.*, 11 Wn. App. 721, 737, 524 P.2d 1355 (1974); *Stratton v. U.S. Bulk Carriers, Inc.*, 3 Wn. App. 790, 793-94, 478 P.2d 253 (1970). Thus, the Edlemans are

foreclosed from obtaining appellate relief premised on this claim.

## II. *Decisions Made after Trial*

¶56 After entry of the trial court's order consolidating the three lawsuits, the cases went to trial. At the conclusion of the 10-day bench trial, the trial court entered numerous findings of fact and conclusions of law, and entered judgment adverse to the Edlemans.

### A. Standard of Review

¶57 Where the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether those findings of fact support the trial court's conclusions of law. *Ridgeview Props. v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982); *Keever & Assocs., Inc. v. Randall*, 129 Wn. App. 733, 737, 119 P.3d 926 (2005). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise. *Ridgeview Props.*, 96 Wn.2d at 719; *Keever & Assocs.*, 129 Wn. App. at 737. If that standard is satisfied, we will not substitute our judgment for that of the trial court even though we might have resolved disputed facts differently. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). There is a presumption in favor of the trial court's findings, and the party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence. *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990).

### B. Internal Setbacks

¶58 The Edlemans contend that the trial court erred by concluding that they must meet the covenants' setback requirements regulating the area along the boundary between their two adjoining lots. We agree.

¶59 Our Supreme Court has spoken clearly on this issue:

> We find the applicable rule, supported by authority, succinctly stated in 20 Am. Jur. 2d *Covenants* § 239, p. 807:

> Where an owner has acquired a plot comprising more than one contiguous lot and seeks to build in such a manner as to overlap what would be the side lines if the lots were owned separately, a side-line restriction is applicable only to the outside lines of the plot, *regardless of how many lots it includes.*

*Weld v. Bjork*, 75 Wn.2d 410, 412, 451 P.2d 675 (1969). Decisions in other states that have confronted this issue are uniformly in conformance with this rule.[19]

¶60 The court in *Weld* relied, in part, on the fact that the covenant at issue in that case did not contain an explicit provision requiring owners of two or more contiguous lots to meet setback requirements between those lots. The court explained:

> If this be the intention of the owner establishing the restrictive covenant, it is difficult to understand why such an intention was not made plain by the use of terms having recognized meanings. It would have been simple to state that each lot may have only one residential building placed so that it complies

---

[19] *See, e.g., Stowe v. Briggs*, 451 S.W.2d 152 (Ky. 1970) (developer may build apartment complex on contiguous lots because sideline restrictions applicable only to the outside lines of entire plot); *Watters v. Blatt*, 249 Mass. 340, 144 N.E. 106 (1924) (interior setback requirements not applicable to house built across interior dividing line of two lots owned by one person); *Goldstick v. Thomas*, 237 Mich. 236, 211 N.W. 666 (1927) (setback requirements not applicable to apartment house built across interior dividing line of two lots owned by one person); *Marrick v. Furnari*, 237 Mich. 239, 211 N.W. 667 (1927) (sideline restrictions applicable only to exterior boundaries of tract when contiguous lots are owned by same person); *Scott v. Bd. of Missions N.C. Annual Conference*, 252 N.C. 443, 114 S.E.2d 74 (1960) (building to be constructed on three adjoining lots must comply only with sideline restrictions from exterior lots); *Stone v. Avalon Ice & Cold Storage Co.*, 2 N.J. Misc. 628, 131 A. 579 (1924) (building may be built across dividing line between two contiguous lots, notwithstanding sideline restrictions), *aff'd*, 99 N.J. Eq. 425, 131 A. 579 (1925); *Shaffer v. Temple Beth Emeth*, 198 A.D. 607, 190 N.Y.S. 841 (N.Y. App. Div. 1921 ) (sideline restrictions do not prohibit erection of one building on two adjoining lots after acquisition by same owner); *Dougherty v. Fellabaum*, 130 N.E.2d 247 (Ohio Ct. App. 1952) (home and detached garage built across two lots need not conform to setback requirements between the two lots); *Covey v. Gross*, 377 Pa. Super. 580, 547 A.2d 1214 (1988) (treating two contiguous lots as a single lot for purposes of applying restriction permitting private garages only on lots where a house has first been erected).

with the sideline requirements of each lot as platted, and that one house could not be constructed upon two or more lots owned by the same person. The covenant does not do this.

*Weld*, 75 Wn.2d at 411-12. Similarly, the covenants at issue herein contain no explicit provision prohibiting construction of a building across two lots owned by the same person.[20] Our Supreme Court's decision in the *Weld* case is, therefore, directly controlling.

¶61 The Community Club nevertheless contends that we should refuse to apply the *Weld* rule in this case, arguing that the case's holding is dependent on the rule that restrictive covenants are to be "construed strictly against the grantor and those claiming the benefits of the restrictions," *Weld*, 75 Wn.2d at 411, a rule that has since been rejected by the Supreme Court in *Riss*, 131 Wn.2d at 623 (the court's role is to ascertain and give effect to those purposes intended by the covenants rather than to construe covenants strictly against the grantor). Our reading of *Weld*, however, does not convince us that the Supreme Court's holding was so dependent on its strict construction analysis that the court would have held differently in its absence. This view is especially compelling given that *Weld* was decided consistently with the uniform decisions of appellate courts across the country.

¶62 Moreover, even if we believed *Weld* to be incorrectly decided, we would not be free to ignore its applicability. The *Weld* decision has not been overruled in any subsequent Supreme Court opinion. It, therefore, remains a valid statement of Washington law as pronounced by our

---

[20] Section 18 of the covenants provides that "[n]o more than one single-family dwelling shall be constructed on any 'building site' as established on lots," and Section 1 of the covenants defines the "building site on any lot" as "that portion of the lot which is included within the set-back lines from the street and side and rear properly lines of such lot." Here, there are two building sites on the Edlemans' land, and the covenants prohibit the construction of more than one dwelling on either of them. As was the case in *Weld*, however, these provisions do not prohibit the erection of one dwelling across two building sites. *Accord Busch v. Johnston*, 107 Fla. 631, 145 So. 872 (1933); *Struck v. Kohler*, 187 Ky. 517, 219 S.W. 435 (1920) (restriction against constructing more than one building on single lot did not prohibit constructing one building across two lots).

Supreme Court. Accordingly, we are duty-bound to apply the *Weld* rule, whatever its underpinnings may have been. *Hamilton v. Dep't. of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988) ("Once this court has decided an issue of state law, that interpretation is binding until we overrule it." (citing *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984),[21] *superseded on other grounds by* RCW 9.41.040(3))). We are not free to ignore the holding in *Weld*; neither was the trial court.

¶63 The trial court erred by concluding that the Edlemans were required to meet the covenants' setback requirements regulating the area along the boundary between their two adjoining lots. We reverse the decision of the trial court on this basis and remand the consolidated causes to the trial court for a determination of the appropriate remedy in light of our decision. In order to provide guidance to the parties and the trial court on remand, we now reach the merits of the Edlemans' remaining claims.

C. Community Club Acted Reasonably and in Good Faith

¶64 The Edlemans next contend that the trial court erred by concluding that the Community Club acted reasonably and in good faith in processing and denying their proposed building plans.[22] We disagree.

---

[21] "In failing to follow directly controlling authority of this court, the Court of Appeals erred. . . . [O]nce this court has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled by this court. *Godefroy v. Reilly*, 146 Wash. 257, 262 P. 639 (1928); *cf. Hutto v. Davis*, 454 U.S. 370, 375, 102 S. Ct. 703, 70 L. Ed. 2d 556 (1982) ('unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts . . . ')." *Gore*, 101 Wn.2d at 487.

[22] The trial court found in part:

The Edlemans claimed the [Community Club]'s actions and denial of their plans were unreasonable, arbitrary and not in good faith. This Court finds the credible testimony and documentary evidence at trial established by a preponderance of the evidence that the [Community Club] Board's action relating to the Edlemans and its denial of the Edlemans' proposed structures were reasonable, not arbitrary, and in good faith.

¶65 The reasonableness of the Community Club's actions is a question of fact. As such, we review the trial courts findings on this issue to determine if they are supported by substantial evidence. *Ridgeview Props.*, 96 Wn.2d at 719. Our review of the record convinces us that substantial evidence supports the trial court's determination.

¶66 The trial court properly noted that covenants requiring consent before construction will be upheld only if the authority to consent is exercised reasonably and in good faith. *Riss*, 131 Wn.2d at 625; *Day v. Santorsola*, 118 Wn. App. 746, 758, 76 P.3d 1190 (2003); *Heath*, 106 Wn. App. at 516-17.

¶67 The reported cases guide our review of the trial court's determination. In *Riss*, the Supreme Court held that the homeowners association charged with the authority to approve or disapprove construction plans unreasonably denied consent to construct because the members of the association did not visit the site of the proposed construction or make objective comparisons with existing homes, the decision was based largely on inaccurate representations regarding the impact of the proposed structure made by two of the board members, and the association ultimately imposed more burdensome requirements than those imposed by covenant provisions requiring compliance with specific size and setback guidelines. *Riss*, 131 Wn.2d at 625, 628-29.

¶68 In *Day*, it was similarly held that consent to construct was unreasonably withheld because the denial was based largely on investigations made and information prepared by a neighbor who was adamantly opposed to the proposed construction, rather than being based on an objective investigation by the committee granted the authority to approve or disapprove proposed construction plans. *Day*, 118 Wn. App. at 759, 762.

---

Finding of Fact (FF) 37. The trial court concluded that the Community Club's "actions relating to the Edlemans and its denial of the Edlemans' proposed structures were reasonable and in good faith." Conclusion of Law (CL) 3(e).

¶69 On the other hand, in *Heath*, the court held that the individual charged with the authority to consent acted reasonably in withholding that consent, even though he may have had a personal interest in prohibiting the proposed construction, because he conducted an objective investigation over several days which included a review of the proposed plans and a visit to the site of the proposed construction. *Heath*, 106 Wn. App. at 517-18.

¶70 Here, the Community Club did not attempt to impose more burdensome setback requirements than those imposed by the specific setback provisions of the covenants' themselves. Furthermore, the evidence before the trial court demonstrates that the Community Club board made a reasonable and objective investigation before denying the Edlemans' proposal. The Community Club compared the Edlemans' proposed construction with other homes in the Riviera Section neighborhood, considered the views of neighbors who would be affected by the proposed construction, studied Community Club records to determine what general criteria were used in determining whether to grant approval and variances, and visited the site of the proposed construction.

¶71 The Edlemans contend that the Community Club acted unreasonably because it consulted with neighbors, such as the Benways, who were known to be opposed to the Edlemans construction. We disagree. The Community Club's consultation with neighbors was a reasonable method by which to determine the impact of the proposed construction on the neighborhood. *See Riss*, 131 Wn.2d at 629 (objections of neighbors often aid in the enforcement of restrictive covenants).

¶72 The Edlemans also contend that the trial court's findings were contrary to the evidence and that the Community Club acted unreasonably by appointing an outspoken opponent of the Edlemans' construction to the decision-making board. We disagree with the Edlemans on this point as well. As the court in *Heath* made clear, the potential bias of a decision maker is not sufficient, standing

alone, to render unreasonable the decision to approve or disapprove a proposed construction. *Heath*, 106 Wn. App. at 517-18. As was the case in *Heath*, the Community Club made a thorough and objective investigation into the Edlemans' proposed construction. In contrast to the situations arising in *Riss* and *Day*, the evidence here led the trial court to conclude that the Community Club's decision was the product of that objective investigation. The record contains substantial evidence in support of this finding.

¶73 Finally, the Edlemans ask us to hold that proceedings enforcing covenants are per se unreasonable when undertaken by an organization, such as the Community Club, in which the decision makers are not elected by the property owners subject to the covenants, and where the only members of the organization are the board members themselves, rather than property owners as a whole.[23] As discussed previously, questions regarding the composition of the decision-making board go to its "authority." Questions regarding the "reasonableness" of the decision made presuppose the authority of the decision maker and focus on the process employed and the facts considered.[24] In the lawsuit they initiated questioning the authority of the Community Club to act, the Edlemans abandoned this claim. Their attempts to "bring the issue in through the back door" are unavailing. The question of "authority" deals with *who* acts. The question of "reasonableness" deals with *what* actions are taken. The Edlemans' concerns regarding how the Community Club board is constituted do not pertain to the question of "reasonableness," and the trial court did not err by discounting this evidence when evaluating that question.[25]

---

[23] This is a version of the claim the trial court deemed abandoned.

[24] Indeed, in *Heath*, the sole individual charged with the responsibility to approve or disapprove construction plans was appointed, not elected. The *Heath* court upheld the reasonableness of that individual's decision based on the objective investigation conducted and procedures employed. *Heath*, 106 Wn. App. at 517-18.

[25] The Edlemans also contend that we should deem the procedures undertaken by the board unreasonable because the Edlemans were denied both notice of those

¶74 The trial court's findings of fact on the issue of the "reasonableness" of the Community Club's actions and its "good faith" are supported by substantial evidence. Those findings support the trial court's conclusion that the Community Club acted lawfully in processing and denying the Edlemans' proposed building plans. There was no error.

### D. Covenants Have Not Been Abandoned

¶75 The Edlemans next contend that the trial court erred by finding that the covenants have not been abandoned.[26] We disagree.

---

board meetings in which their construction plans were discussed and the opportunity to be heard before the board. We disagree. The trial court found:

> The Edlemans claimed the [Community Club]'s dealings with them and the approval process was unreasonable and flawed and they were denied the process that other homeowners received. The Court finds by a preponderance of the evidence that the Edlemans were not denied any due process by the [Community Club] relating to the Covenants. The Edlemans never requested a hearing with the [Community Club] and the evidence establishes that no homeowner who ever requested a hearing was denied one. Once the Plans were submitted to the [Community Club] in February, 2004 and approval was denied, the Edlemans were offered the chance to communicate with the Board and did not do so. The [Community Club] did not deny any hearing to the Edlemans. The [Community Club] acted reasonably under all the circumstances, including the fact that litigation was pending between the parties.

FF 34. This finding is supported by substantial evidence in the record. The Edlemans' contention is unavailing.

[26] The trial court found:

> The Edlemans claimed the Covenants were abandoned due to lack of enforcement or inconsistent enforcement. The Edlemans failed to prove by a preponderance of the evidence that the Covenants were habitually or substantially abandoned. The Edleman's [sic] provided examples of instances, some alleged and some established by the evidence, in which property owners have allegedly violated the Covenants by not getting approval for plans and building outside the established buildable space for a lot. However, given the amount of homes in the Riviera Section, such anecdotal evidence does not establish a habitual or substantial abandonment of the Covenants or the Covenants' general plan.

FF 22.

> [T]he testimony and documentary evidence, including the records of the [Community Club], established that the Covenants have not been abandoned. While there is not evidence of enforcement every year since 1929, there was substantial evidence that the [Community Club] has been involved with compliance issues consistently since the Covenants were established.

FF 23.

■ ¶76 Whether the evidence supports a finding of abandonment is a question of fact. *White v. Wilhelm*, 34 Wn. App. 763, 769-70, 665 P.2d 407 (1983); *Sandy Point Improvement Co. v. Huber*, 26 Wn. App. 317, 319, 613 P.2d 160 (1980). As such, we review the trial court's findings on this issue to determine if they are supported by substantial evidence. *Ridgeview Props.*, 96 Wn.2d at 719. Again, our review of the record convinces us that substantial evidence supports the trial court's determination.

■ ¶77 If a covenant applying to an entire tract has been habitually and substantially violated so as to create an impression that it has been abandoned, equity will not enforce the covenant. *Mt. Baker Park Club, Inc. v. Colcock*, 45 Wn.2d 467, 471, 275 P.2d 733 (1954); *Sandy Point*, 26 Wn. App. at 319. A few such violations, however, do not constitute abandonment. *White*, 34 Wn. App. at 769-70; *see, e.g., Sandy Point*, 26 Wn. App. at 319 (two violations in 1000-lot development did not constitute abandonment); *Reading v. Keller*, 67 Wn.2d 86, 90-91, 406 P.2d 634 (1965) (one violation did not constitute abandonment).

¶78 Here, the evidence before the trial court demonstrates that the covenants have been consistently enforced by the Community Club and its predecessors. The Edlemans were able to point to only a few specific instances of questionable covenant enforcement among the 500 lots governed by the covenants, and many of the homeowners in those instances had received variances from the Community Club in order to build outside of the covenant setback lines, as is permitted by covenant provisions.

¶79 The trial court's findings of fact on this issue are supported by substantial evidence. Those findings support the trial court's conclusion that the covenants had not been abandoned and are, therefore, valid and enforceable against the Edlemans. There was no error.

---

The court concluded that "[t]he Covenants are valid, binding and enforceable." CL 3(a).

### E. Edlemans Not Entitled to a Balancing of the Equities

¶80 The Edlemans next contend that the trial court erred by refusing to balance the equities of the parties before issuing the injunction requiring demolition of their home and garage.[27] We disagree.

¶81 We review a trial court's decision to grant an injunction for abuse of discretion. *Holmes Harbor Water Co. v. Page*, 8 Wn. App. 600, 603, 508 P.2d 628 (1973). *Accord Niemann v. Vaughn Cmty. Church*, 154 Wn.2d 365, 374, 113 P.3d 463 (2005) ("trial courts have broad discretionary power in fashioning equitable remedies"). A trial court abuses its discretion when its decision or order is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons. *Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 665, 989 P.2d 1111 (1999).

¶82 In considering whether to grant an injunction requiring the removal of an erected building or structure, a trial court may balance the equities of the parties, weighing factors such as the character of the interest to be protected and the relative hardship likely to result to the defendant if an injunction is granted or to the plaintiff if it is denied. *Holmes Harbor Water Co.*, 8 Wn. App. at 603. The benefit of the doctrine of balancing the equities, however, is reserved for the innocent party who proceeds without knowledge or warning that his structure encroaches upon another's property or property rights. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 699-700, 974 P.2d 836 (1999); *Bach v. Sarich*, 74 Wn.2d 575, 582, 445 P.2d 648 (1968); *Peterson v. Koester*, 122 Wn. App. 351, 359, 92 P.3d 780 (2004). If a party takes a calculated risk by proceeding, despite notice that doing so violates the property rights of others, that party forfeits the right to a balancing of the equities. *Hollis*, 137 Wn.2d at

---

[27] The trial court concluded that "[t]he Edlemans, who had notice of the Covenants, the setbacks on their two lots . . . and the requirement to submit plans and obtain [Community Club] written approval before construction, and were aware that a lawsuit was pending which could require them to remove their structures if they did not prevail, are not entitled to a balancing of the equities as to whether the structures should be removed." CL 5.

700; *Arnold v. Melani*, 75 Wn.2d 143, 152, 437 P.2d 908 (1968).

¶83 The trial court made several findings that the Edlemans had clear notice that they were constructing their house and garage in violation of the covenants.[28] The trial court's findings of fact on this matter are supported by substantial evidence in the record. The Edlemans were given clear warning before construction began that they were required by the covenants to submit their plans to the Community Club for approval and to comply with specific setback requirements for their lots. The trial court correctly concluded that the Edlemans took a calculated risk by proceeding with construction in the face of such warnings.[29]

¶84 The trial court's findings that the Edlemans were on notice that their construction was in violation of the cov-

---

[28] The trial court found:

In January 2002 approximately ten months before the Edlemans commenced construction, the [Community Club] sent a letter to the Edlemans requesting they abide by the Covenants and informing them about the Covenants and the specific setbacks for their 2 lots. The [Community Club] also provided the Edlemans with that letter and a petition from over 30 homeowners, including the Benways, requesting the Edlemans voluntarily comply with the Covenants including the setback restrictions in the Covenants.

FF 28.

Before they commenced construction on their property, the Benways warned Mr. Edleman that the Covenants would be legally enforced against the Edlemans.

FF 29.

This Court finds the credible testimony and documentary evidence at trial established by a preponderance of the evidence that the Edlemans were repeatedly informed orally and in writing about the Covenants, the setbacks, and that they were required to submit plans and obtain the written approval of the [Community Club] Board before constructing any residence or garage. The Edlemans received written communications . . . .

FF 32.

[29] Despite the Edlemans' contention to the contrary, it was not reasonable for them to conclude from the trial court's denial of the Benways' motion for a temporary restraining order that they were entitled to proceed with construction without risk of facing future injunction. The trial court's denial of the motion did not amount to a ruling that the covenants were not enforceable against them. The Edlemans were not entitled to subvert the requirements of the covenants by completing construction before the trial court had ruled on the covenants' enforceability.

enants are supported by substantial evidence. Those findings support the trial court's conclusion that the Edlemans are not entitled to a balancing of the equities. Again, there was no error.

III. *Postjudgment Motion*

¶85 Finally, the Edlemans contend that the trial court erred by denying the Edlemans' postjudgment motion for the entry of an order requiring that the Community Club process the Edlemans' revised application. We disagree.

¶86 The Edlemans argued in their motion that the Community Club's refusal to process the Edlemans' revised application was in violation of the trial court's prior ruling. The trial court considered the Edlemans' request as a motion to clarify the court's final orders and judgment.

¶87 CR 60(a) allows a court to correct clerical mistakes in a judgment by correcting language that did not convey the court's intention or to supply language that was inadvertently omitted. *Presidential Estates Apartment Assocs. v. Barrett*, 129 Wn.2d 320, 326, 917 P.2d 100 (1996). The rule does not, however, allow a trial court to rethink the case and enter an amended judgment different than that originally intended. *Presidential Estates*, 129 Wn.2d at 326. We review determinations made by the trial court under CR 60(a) pursuant to an abuse of discretion standard. *Presidential Estates*, 129 Wn.2d at 325-26.

¶88 The trial court correctly noted that it had not entered any final orders requiring the Community Club to consider future plans submitted by the Edlemans. Accordingly, the trial court acted within its discretion by denying the Edlemans' motion.

IV. *Remand*

¶89 On remand, the trial court retains full authority to exercise its discretion in determining the appropriate remedy in light of this decision. It is not properly our role to substitute our judgment for that of the trial court, and we do not seek to do so. As we have previously noted, "the

central idea of discretion is *choice*: the court has discretion in the sense that there are no 'officially wrong' answers to the questions posed." *Coggle v. Snow*, 56 Wn. App. 499, 505, 784 P.2d 554 (1990) (quoting Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 SYRACUSE L. REV. 635, 636-37 (1971)). It is to the trial judge that the law gives the authority to exercise discretion in formulating an appropriate remedy. We remand this matter to the trial court for that purpose.

V. *Conclusion*

¶90 We affirm the trial court's determinations that the Edlemans violated the covenants by erecting their house without first obtaining the written approval of the Community Club, by similarly erecting their garage without first obtaining the written approval of the Community Club, and by building the house and garage outside the covenants' setback requirements for the street sides of their two adjoining lots. We reverse the trial court's conclusion that the Edlemans violated the covenants by building their house and garage over the setback areas along the boundary between their two adjoining lots.

¶91 Affirmed in part, reversed in part, and remanded.

BAKER and BECKER, JJ., concur.

Reconsideration granted in part and opinion modified April 6, 2007.