George W. SKINNER, President, Fred A. Hermann, Jr., George P. Budke, E. Lawrence Keyes, Jr., Rueben M. Morriss, III, Secretary-Treasurer, Individually and as Trustees of Briarcliff Subdivision, Plaintiffs-Respondents,

v.

Leonard H. HENDERSON and Beulah C. Henderson, his wife, and Dr. Marvin Rosecan and Mary Jo Rosecan, his wife, Defendants-Appellants.

No. 37365.

Missouri Court of Appeals, St. Louis District, Division Two.

Sept. 27, 1977.

Robert F. Ritter, Gray & Ritter, Thomas C. Devoto, St. Louis, for defendants-appellants.

John J. Cole, Armstrong, Teasdale, Kramer & Vaughn, St. Louis, for plaintiffs-respondents.

STEWART, Judge.

This is a civil action in equity initiated by plaintiffs, individually and as Trustees of Briarcliff Subdivision to permanently enjoin defendants from erecting, occupying, using and maintaining a certain swimming pool enclosure, and further to enjoin defendants from erecting any swimming pool enclosure without prior written approval of the trustees in violation of the subdivision trust indenture. The trial court, sitting without a jury, found that the swimming pool enclosure was a structure, within the meaning of the prohibition of the indenture, and entered judgment for the plaintiffs individually as lot owners and also as trustees of the subdivision as prayed. We affirm.

Defendants contend that: (1) the trial court erred in finding that the swimming pool enclosure was a "structure" within the meaning of the indenture, because there is no definition of the word "structure" in the indenture, and it is ambiguous with respect to a swimming pool enclosure; (2) the trial court erred in concluding that the swimming pool enclosure was a "structure" within the meaning of the indenture, because the pool enclosure is portable, temporary, and not permanently located in that the weight of the evidence established that a "structure," to be within the meaning of the indenture, must be permanently affixed to the ground; (3) the trial court erred in enjoining the defendants from using the pool enclosure because the trustees have waived their right to enforce the indenture in that they have failed to enforce restrictions in the past; (4) the trial court erred in granting injunctive relief to the plaintiffs, because the indenture is in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 2 of the Constitution of the State of Missouri (1945), rendering it void and unenforceable in that the primary purpose of the indenture was to exclude Negroes from the subdivision.

Appellate review of the trial court's action is controlled by Rule 73.01 V.A.M.R. A decree or judgment of the trial court will be sustained on appeal "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo.1976); Rule 73.01 V.A.M.R.

Specific findings of fact were not requested and were therefore not required. We view the facts most favorably to the result reached by the trial court. *Stark v. Stark*, 539 S.W.2d 779, 781[1] (Mo.App. 1976).

Defendants, Leonard and Beulah Henderson, became owners of record of Lot No. 64 and improvements thereon in Briarcliff Subdivision, St. Louis County, by General Warranty Deed dated January 13, 1969. The deed provided that the conveyance was "made subject to all restrictions, building lines, easements and conditions of record." Shortly thereafter, defendants, Marvin and Mary Jo Rosecan occupied this property and became owners by General Warranty Deed, which has not been recorded.

In 1969 the Rosecans consulted an architect for the purpose of designing a swimming pool and a swimming pool enclosure. The architect advised them that it would be necessary to submit these plans to the Briarcliff Subdivision Board of Trustees for approval. The trustees approved the plan for the swimming pool, but by letter, dated March 11, 1971, the trustees advised the Rosecans that approval for the proposed pool covering [1] had been denied. The Rosecans did not erect the pool enclosure which had not been approved.

On August 4, 1971, without the permission, approval or knowledge of the Briarcliff Trustees, the Rosecans purchased and erected the pool covering which is the subject of this litigation. During November of 1971, the pool enclosure, a custom made clear vinyl dome, 28 feet wide by 58 feet long, was installed. The dome is inflated by an electric blower to the approximate

---

1. The pool covering consisted of permanently affixed poles and guy wires from the poles to the house over which a canopy was to be suspended.

height of 25 feet. It was anchored by a circular vinyl tube filled with water. The estimated weight of the tube, when filled with water, is two and one-half tons. The purpose of the pool cover is to permit swimming year-round. Defendant, Mary Jo Rosecan, testified that the cover was removed during the summer months of 1972 and 1973. It has been inflated and used year round since that time.

The Board of Trustees, in a meeting on November 12, 1971, found that the pool covering was a structure and that it should be removed. The Rosecans did not respond to the trustees' letter, dated November 15, 1971, requesting the removal of the pool cover. On February 25, 1972, the trustees decided to consult an attorney. After further unsuccessful attempts by the plaintiffs to secure the Rosecans' voluntary removal of the pool enclosure, the plaintiffs instituted this action in November of 1973.

The relevant sections of the 1931 Briarcliff Indenture referred to at trial and in appellants' and respondents' briefs are:

.    .    .    .    .

"Whereas, it is the purpose of the parties of the first part and of the trustees that said BRIARCLIFF shall be and remain a residence section of the highest class.

.    .    .    .    .

TRUSTEES EMPOWERED TO ENFORCE RESTRICTIONS.
SIXTH: The Trustees shall have, and are hereby granted full power and authority, in their own names as Trustees of an express trust or otherwise, to prevent any infringement and compel the performance of any restriction. This provision is intended to be cumulative and not to restrict the rights of any estate owner to proceed in his own behalf and the power and authority herein granted to the Trustees is intended to be discretionary and not mandatory.

.    .    .    .    .

BUILDING LINES.
ELEVENTH: Except with the permission of the Trustees no fences or hedges of any type shall be constructed or permitted except on rear estate lines and on that part of the side lines to the rear of the front building line; but no fences permitted shall be of other than open wire, less than four feet in height, and no hedges shall be more than four feet high. All fences, buildings or structures within or upon the estate lines shall be subject to approval of the Trustees.

.    .    .    .    .

RESTRICTIONS ON COST AND OCCUPANCY.
THIRTEENTH: The minimum cost of any residence erected in BRIARCLIFF shall be Fifteen Thousand Dollars ($15,-000.00) and no structure whatsoever, may be erected or begun prior to written approval of the preliminary and final plans by the Trustees."

■ Defendants contend that the swimming pool enclosure is not a structure and, therefore, plaintiffs have no authority to order its removal because defendants failed to obtain the prior approval of the trustees. To support this contention defendants argue that: (1) the term "structure" is ambiguous and any doubts regarding its meaning must be resolved in favor of the free use of the land and; (2) the term "structure" must be construed to refer to permanently affixed objects.

Defendants rely on the general rule stated by our Supreme Court in *Andrews v. Metropolitan Bldg. Co.*, 349 Mo. 927, 163 S.W.2d 1024, 1038 (1942):

"It must be remembered that restrictive covenants 'being in derogation of the fee conveyed by the deed . . . will not be extended by implication to anything not clearly expressed in them, and if there be any ambiguity in the terms of the covenant, or substantial doubt of its meaning, such ambiguity should be resolved, if reasonably it can be, in favor of the use complained of.' "
This principle " 'should never be applied to defeat the plain and obvious purpose of the restriction.' " *Greenberg v. Koslow*, 475 S.W.2d 434, 436[2, 3] (Mo.App.1971). Where "the meaning of [a] terms is ques-

tioned, the rule is that the language used, absent any indication 'that some special or peculiar meaning was intended,' must 'be given its ordinary and usual meaning.'" *Greenberg v. Koslow*, 475 S.W.2d at 436–7[2, 3].

The indenture provides that, "[a]ll fences, buildings or structures within or upon the estate lines shall be subject to approval of the trustees." The trial court held the pool covering to be a "structure." In ascertaining the intent of the indenture it is well to consider the definitions of some of the key words of the indenture. We look first to the word "building." It has been said to be "a fabric or edifice framed or constructed, designed to stand more or less permanently." *McGalliard v. Chapman*, 129 A. 256, 257 (N.J.1925).

It has been applied to include a fruit and vegetable stand with a canvas top strung over poles set in the ground. *McGalliard, supra*; a screened enclosure, *Union Trust Co. v. Lucas*, 125 So.2d 582 (Fla.App.1960). More specifically it is defined as "a: constructed edifice designed to stand more or less permanently covering a space of land usu. covered by a roof and more or less completely enclosed by walls and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure—distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy." Webster's Third New International Dictionary 292 (1967).

From the definition of "building" it can readily be seen that "structure" is a broader, more comprehensive term which includes "building."

This court considered the word "structure" in *Greenberg v. Koslow*, 475 S.W.2d 434 (Mo.App.1971). In that case, defendants built a swimming pool with a plastic bubble top and gave swimming lessons to a solicited clientele on a regular basis for profit. This court held that defendants were in violation of a provision in a subdivision indenture prohibiting the erection of a structure to be used for business purposes.

In holding that the swimming pool was a structure within the meaning of the restrictions the court relied on a "composite definition" derived from 83 C.J.S. *Structure* p. 547 et seq. (1953): "'A structure is . . . a production composed of parts artificially joined together according to plan and design to accomplish a definite purpose,' . . . which 'may be below the surface of the ground as well as above it,' . . . and may include, for example, 'a tunnel and a well . . ..'" *Greenberg v. Koslow*, 475 S.W.2d at 437[4].

The swimming pool cover in this case is completely enclosed on the sides and top, it is capable of resisting the weather; it was designed for that purpose. After 1974 it was in use the year round and was used for social gatherings. The enclosure in question served the same purpose as the enclosure which the architect submitted and which the trustees disapproved. It served as a dwelling and a shelter. It was an adjunct to the swimming pool. We find that the swimming pool cover in this case is a "structure."

Defendants argue that the swimming pool cover is portable and temporary, and, therefore cannot be said to be a "structure" as that word is used in the indenture. We note first that the indenture does not confine the requirement of approval to permanent structures. The definition of structure which we have used above does not embrace the concept of permanence. As noted above "structure" is a broader concept than "building" which has the concept of more or less permanence. "Permanent," does not "'always embrace the idea of absolute perpetuity.'" *State v. Public Service Commission*, 238 Mo.App. 287, 179 S.W.2d 123, 125[1] (1944). We do not believe that the pool covering can be said to be a temporary structure as distinguished from one that is "more or less permanent." The word "temporary" is defined as "1a: lasting for a time only: existing or continuing for a limited time, impermanent, transitory." Webster's Third New International Dictionary 2325 (1967). As applied to building it

connotes an interim [2] structure; a makeshift; something used until the final objective can be accomplished. The pool covering in this case was custom made for this particular pool. This covering was intended to be used so long as it existed. Originally it was to be used during inclement weather in each year. At the time of trial it was being used the year round. The trial court could reasonably conclude that the structure was "more or less permanent" as those words are used in the definition of "building." Under the facts of this case we believe that the swimming pool cover could be found to have come within the definition of building. Having used the word "building" and the word "structure" it is clear that the term "structure" was intended to encompass a broader concept than "building." If the pool enclosure can be said to be a building it can be said to come within the broader term "structure."

The purpose of the restrictions in the Briarcliff Indenture, as stated in the preamble, is to retain its status as a "residential section of the highest class." While such recitals may not broaden the restrictions, we may consider this expression in the indenture in determining the intent of the instrument. *Keener v. Berry,* 442 S.W.2d 159, 162[3] (Mo.App.1969). The restriction requiring that owners obtain the approval of the trustees for proposed structures was one of many provisions intended to ensure that the subdivision remain a residential area of high quality and that buildings and structures placed upon the lots be compatible with the area. The word "structure" is broad in concept but it is not ambiguous, as we have demonstrated. In 1931, as now, it was impossible to conceive of all the objects which may come within the category of "buildings" and of "structures" which the authors of the indenture would wish to be approved prior to erection

in the subdivision. The intent of the indenture was to ensure that the trustees review all manner of objects that might be placed upon the lots of the residents so as to carry out the purpose of the restrictions. The court did not err when it concluded that the swimming pool cover was a structure which was required to be approved by the trustees before it could be erected on the lot of the defendants.

Defendants next contend that plaintiffs, by their past conduct, have waived their right to seek judicial enforcement of the Briarcliff Indenture. They rely on *Scharer v. Pantler,* 127 Mo.App. 433, 105 S.W. 668 (1907) and *Lake St. Louis Community Association v. Kamper,* 503 S.W.2d 447 (Mo.App.1973) to support their defense of waiver. Neither of these cases are helpful in determining this issue. Both cases involved the prior violation and hence, waiver of specific restrictive covenants.[3]

Defendants point to the indenture restriction providing "but no fences permitted shall be of other than open wire, less than four feet in height . . .," and allege that the trustees have permitted fences not conforming to this provision. Contrary to defendants' contention, the record shows that this restriction applies only to fences on rear estate lines and on that part of the side lines to the rear of the front building line. The trust indenture does provide that "fences, buildings or structures within or upon the estate lines are subject to the approval of the trustees." The record shows the trustees have approved fences other than open wire to hide something unsightly, an ash can or air conditioner, to enhance the appearance of the property. Walks, other than brick, as provided in the indenture, have been approved by the trustees where the brick walk was impractical

---

2. See Roget's International Thesaurus 50 § 109.4 (3rd ed.1962).

3. In *Scharer* the original grantor in subdividing restricted the building line to not less than 25 feet from the street. The grantor, however, built the first three houses on a line 15 feet from the street.

In *Kamper,* plaintiff sought to have defendants remove a builder's sign from a lot. The plaintiff's manager, for a long period, encouraged the use of such signs and, at times, furnished signs to builders.

or presented a hazardous condition. The trustees, in their approval or rejection of the preceding alleged violations, have acted in their discretionary power to prevent infringements, to compel the performance of restrictions, and to preserve the aesthetic quality of the subdivision. In doing so they have been guided by considerations of compatability of the structure with the neighborhood or possible objections to the structure by the neighbors.

The defendants claim that the trustees have permitted structures, a shed, carport, a log cabin playhouse, without their approval. The evidence shows that some of these objects have since been removed or the trustees have requested removal.

This court has stated that "there are no hard and fast rules as to what constitutes a waiver" and that "each case must be decided on its own facts." *Lake St. Louis Community Association v. Kamper*, 503 S.W.2d at 449[1–4]. The trial court was warranted in finding that the trustees have acted to enforce the terms of the indenture reasonably with a regard for the quality of the subdivision. They have not waived their right to enforce the terms of the indenture.

■ Defendants urge that the section of the indenture entitled "Restrictions Against Negroes," [4] when read with other sections regarding minimum costs of property, the intention that the subdivision be a high class residence, and the provision that temporary buildings may not be inhabited, shows that the primary purpose of the indenture is to exclude Negroes from living in the subdivision.

The Briarcliff Indenture, in the section entitled "Miscellaneous," provides:

"These restrictions, limitations and easements are to be construed independently, and in the event any of them shall be declared void or for any reason unenforceable, the validity and binding effect of the others shall not be impaired or affected. The waiver or failure to enforce a breach of any restriction, limitation or easement shall not be a waiver of any subsequent breach thereof."

This court, in *Schibi v. Miller*, 268 S.W. 434 (Mo.App.1925), held that contracts combining a separable and illegal provision will be enforced if it is unnecessary to rely on the illegal provision. The racial covenant is severable from other portions of the indenture. It does not affect the enforceability of other indenture restrictions. The provisions of the indenture, apart from the section "Restrictions Against Negroes," do not restrict the subdivision to Caucasians only. These other provisions support the purpose of the preamble of the indenture, to maintain Briarcliff as a high-class residence.

We conclude that the judgment of the trial court is supported by substantial evidence, is not against the weight of the evidence, does not erroneously declare the law, or erroneously apply the law.

The judgment is affirmed.

McMILLIAN, P. J., and RENDLEN, J., concur.

---

4. That section reads:
No land, buildings or interest in BRIARCLIFF may be by any person or corporation sold or resold, conveyed, leased, rented to, or in anyway occupied, used or acquired by others than members of the Caucasian race, except the bona fide servants and employees living with families of residents of BRIARCLIFF may reside in the homes of such members while so employed.

The 1931 Briarcliff Indenture was amended in December of 1973, primarily for the purpose of changing the term from fifty years to perpetuity and to delete the provision restricting occupancy to Caucasians only.