100

[No. 40947-0-II.   Division Two.   November 22, 2011.]

RANDY S. JENSEN, *Appellant*, v. LAKE JANE ESTATES, *Respondent*.

*James V. Handmacher* (of *Morton McGoldrick PS*), for appellant.

*Dianne K. Conway*, for respondent.

¶1 WORSWICK, A.C.J. — Randy Jensen requested approval from his neighborhood association, Lake Jane Estates (LJE), to subdivide property within the neighborhood plat. LJE denied his request and he filed suit. After a bench trial, the trial court found in favor of LJE. Jensen now appeals, challenging the authority of LJE to make subdivision decisions and asserting that it acted in bad faith in denying his request. We affirm.

## FACTS

¶2 LJE is the homeowners association for a subdivision of approximately 440 residential lots within the city of Bonney Lake. The subdivision was created in 1959 through the Debra Jane Lake Plat and consists of relatively large lots. The subdivision is situated around a lake, and it provides several public amenities, such as parks, lake access, a pool, and a tennis court. When the developer, the Lake Tapps Development Company, recorded the plat with

Pierce County in 1959, it set forth several restrictive covenants on the face of the plat. The plat notation includes a provision that covenants run with the land and bind future owners, their heirs, successors, or assigns. These restrictions are recorded with Pierce County.

¶3 One of the restrictive covenants, restriction 6, states, "No lot in this plat shall be subdivided without the written consent of the LAKE TAPPS DEVELOPMENT CO., INC." Clerk's Papers (CP) at 133. Paragraph 14 of the plat restrictions states that "[t]he breach of any of the foregoing conditions shall constitute a cause of action against the person committing the breach by T&J Maintenance Company [now known as LJE] or the Lake Tapps Development Company." CP at 133. The developer also filed articles of incorporation and bylaws for the T&J Maintenance Company, which later changed its name to Lake Jane Estates. The purpose of LJE was to "take care of the development's amenities, including the lake and park, so that the lots were more valuable." CP at 133-34. The articles also gave the association authority to enforce the restrictive covenants.

¶4 Starting in 1973, LJE received and approved various requests to subdivide lots within the plat. In 2000, LJE successfully filed two suits to uphold its right to enforce restriction 6. *See Lake Jane Estates Homeowners Ass'n v. City of Bonney Lake*, noted at 117 Wn. App. 1045,[1] 2003 WL 21500745, at *1, *5, 2003 Wash. App. LEXIS 1319, at *2-3, *12-13. In 2003, Lake Tapps Development Company dissolved.

¶5 Jensen owns two lots containing single family homes within the plat. In November 2005, he submitted an application to LJE seeking approval to subdivide these two lots into six. In May 2006, LJE rejected his request. Jensen filed suit, and the trial court granted his motion for judgment on the pleadings. LJE appealed, and we reversed, holding

---

[1] This suit, however, did not address the covenant's validity as the developer was still validly incorporated at the time.

104

judgment on the pleadings was improper.[2] *See Jensen v. Lake Jane Estates,* noted at 144 Wn. App. 1033, 2008 WL 2026096, at *1, *7, 2008 Wash. App. LEXIS 1126, at *1, *21.

¶6 On remand, the trial court held a bench trial. The trial court found in favor of LJE and upheld the denial of Jensen's request to subdivide, concluding that LJE was a direct and de facto successor of the developer. The trial court also held that LJE did not act in bad faith in making its decision. Jensen now appeals.

## ANALYSIS

¶7 Jensen argues that (1) restriction 6 is unenforceable, (2) LJE acted unreasonably and in bad faith, (3) the trial court erred in refusing to allow Jensen to testify regarding damages, and (4) the trial court erred in relying on an informal membership poll. We affirm.

### I. STANDARD OF REVIEW

¶8 When we evaluate the evidence in a bench trial, our review is limited to determining whether substantial evidence supports the findings and whether the findings support the conclusions of law. *Standing Rock Homeowners Ass'n v. Misich,* 106 Wn. App. 231, 242-43, 23 P.3d 520 (2001). Substantial evidence is the "quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Sunnyside Valley Irrigation Dist. v. Dickie,* 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We review all reasonable inferences in the light most favorable to the prevailing party. *Korst v. McMahon,* 136 Wn. App. 202, 206, 148 P.3d 1081 (2006). Though the trier of fact is free to

---

[2] We held there were material questions of fact as to whether LJE was a successor to the developer for purposes of restriction 6. We further held that the trial court erred in refusing to treat Jensen's motion as a motion for summary judgment because LJE presented material evidence outside of the pleadings. Thus, on appeal, we treated Jensen's motion as if it were for summary judgment and considered all facts in the light most favorable to LJE.

believe or disbelieve any evidence presented at trial, "[a]ppellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact." *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009), *review denied*, 168 Wn.2d 1041 (2010). Unchallenged findings are verities on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 87 P.3d 313 (1994). And we review questions of law de novo. *Sunnyside Valley*, 149 Wn.2d at 880.

## II. AUTHORITY TO APPROVE SUBDIVISIONS

¶9 Jensen contends that the trial court erred when it determined that LJE could deny his subdivision request under restriction 6 as both a direct successor to the developer and as a de facto successor. We disagree.

### A. *Direct Authority To Approve Subdivisions*

¶10 Jensen first argues that restriction 6 is unenforceable because LJE is not authorized to approve the subdivision of lots. The interpretation of a restrictive covenant is a question of law that we review de novo. *Wimberly v. Caravello*, 136 Wn. App. 327, 336, 149 P.3d 402 (2006). Our primary task is to determine the covenant drafters' intent. *Wimberly*, 136 Wn. App. at 336. Basic rules of contract interpretation apply to the court's review of restrictive covenants. *Wimberly*, 136 Wn. App. at 336. Under such rules, reviewing courts must generally give words in a covenant their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 504, 115 P.3d 262 (2005). In order to be ambiguous, a covenant must be uncertain or two or more reasonable and fair interpretations must be possible. *White v. Wilhelm*, 34 Wn. App. 763, 771, 665 P.2d 407 (1983). But ambiguity is not a prerequisite for a court to examine the context surrounding the execution of a contract. *Berg v. Hudesman*, 115 Wn.2d 657, 669, 801 P.2d 222 (1990).

¶11 Washington courts have moved away from the position of strict construction historically adhered to when interpreting restrictive covenants. *Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 120, 118 P.3d 322 (2005). This is due in large part to a shift in perception regarding restrictive covenants. *See Viking Props.*, 155 Wn.2d at 120. Instead of viewing such covenants as restraints on the free use of land, Washington courts have acknowledged that restrictive covenants " 'tend to enhance, not inhibit, the efficient use of land.' " *Viking Props.*, 155 Wn.2d at 120 (quoting *Riss v. Angel*, 131 Wn.2d 612, 622, 934 P.2d 669 (1997)). Similarly, covenants also tend to enhance the value of the land. *Green v. Normandy Park Riviera Section Cmty. Club, Inc.*, 137 Wn. App. 665, 683, 151 P.3d 1038 (2007), *review denied*, 163 Wn.2d 1003, 180 P.3d 783 (2008). Consequently, we strive to interpret restrictive covenants in such a way that protects the homeowners' collective interests and gives effect to the purposes intended by the drafters of those covenants to further the creation and maintenance of the planned community. *Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 61 Wn. App. 177, 181, 810 P.2d 27 (1991).

¶12 Where a subdivision developer drafts and records restrictive covenants and reserves the power to enforce those covenants for itself but does not explicitly state whether its successors or any other entity will have that authority, Washington courts acknowledge that the purposes of the covenants as well as the expectations of the property owners would be frustrated if the power to enforce the covenants ended when the developer ceased to exist. *Green*, 137 Wn. App. at 684. For example, in *Green*, a subdivision developer wrote and recorded covenants in 1929 that ran with the land and required the approval of the developer or its successors for all proposed building plans in the subdivision. 137 Wn. App. at 682-83. Then, the developer lost its interest in a foreclosure sale to a bank and the bank later sold that interest to Normandy Park Company. *Green*, 137 Wn. App. at 683. Ten years after it acquired

the developer's interest, Normandy Park Company recorded a document entitled "Conveyance of Authority to Enforce Restrictions" that gave the power to enforce the subdivision's covenants to an entity it had recently incorporated, Normandy Park, Riviera Section, Community Club Inc. (NPRSCC) and its successors and assigns. *Green*, 137 Wn. App. at 682. NPRSCC enforced the subdivision's covenants for 30 years, until the secretary of state administratively dissolved it. *Green*, 137 Wn. App. at 682-83. Despite the end of NPRSCC's corporate existence, its officers continued to meet and enforce the covenants. *Green*, 137 Wn. App. at 683. Eleven years after NPRSCC was administratively dissolved, the individuals who had continued to enforce the covenants formed a new corporation, called Community Club, and it then enforced the covenants. *Green*, 137 Wn. App. at 683.

¶13 Fourteen years after Community Club began enforcing the subdivision's covenants, a lot owner challenged its authority to enforce the covenants, arguing that only the developer had the authority to enforce the covenants. *Green*, 137 Wn. App. at 681-82. The court disagreed, holding that even though the covenants did not explicitly state that the developer's successors had the power to enforce the covenants, the purposes of the covenants as well as the land owners' expectations would be frustrated if no entity had that power. *Green*, 137 Wn. App. at 684. Further, the court held that because covenants benefit land and increase its value, that benefit would be lost if the authority to enforce the covenants ended when the developer ceased to exist. *Green*, 137 Wn. App. at 684. Thus, the developer's authority to enforce the covenants ultimately transferred to NPRSCC. *Green*, 137 Wn. App. at 685. Moreover, the court held that Community Club had authority to enforce the covenants as NPRSCC's successor even though the State had administratively dissolved NPRSCC 11 years before Community Club was formed and even though no one ever explicitly conveyed the authority to enforce the covenants to Community Club. *Green*, 137 Wn. App. at 685-86.

¶14 Similarly, in a Missouri case *Green* favorably cited, a construction company developed a subdivision and recorded covenants, one of which required written approval of building plans from "the Company" before any lot owner built any structure on their land. *Sherwood Estates Homes Ass'n v. Schmidt*, 592 S.W.2d 244, 245 (Mo. Ct. App. 1979). Then, the developer conveyed the power to enforce the covenants to the homeowners association. *Sherwood*, 592 S.W.2d at 245. When a lot owner later challenged the homeowners association's power to approve or disapprove building plans, the court held that the power to enforce the covenants included the power to approve or disapprove building plans. *Sherwood*, 592 S.W.2d at 248.

¶15 The court reasoned that the power to enforce the covenant would be meaningless if the homeowners association did not also have the power to approve or disapprove proposed building plans. *Sherwood*, 592 S.W.2d at 247. The court further noted that the homeowners association shared a common purpose with the developer: to maintain a subdivision " 'of the highest class.' " *Sherwood*, 592 S.W.2d at 247 (internal quotation marks omitted) (quoting *Skinner v. Henderson*, 556 S.W.2d 730, 734 (Mo. Ct. App. 1977)). Because of the common interest between the developer and the homeowners association, after the developer ended its involvement in the subdivision and ended its existence as an entity, the homeowners association was the most suitable entity to assume all of the powers and duties associated with the covenants, including the power to approve or disapprove building plans. *Sherwood*, 592 S.W.2d at 248. Thus, the homeowners association had authority to approve or reject proposed building plans even though the recorded covenant stated that "the Company" had that power. *Sherwood*, 592 S.W.2d at 248.

¶16 Here, as in *Green* and *Sherwood*, holding that only the developer had the power to approve or disapprove proposed subdivisions would undermine the purpose of the covenants and the corresponding benefit to the landowners

because the developer no longer exists. Restriction 6 states, "No lot in this plat shall be subdivided without the written consent of the LAKE TAPPS DEVELOPMENT CO." CP at 133. Despite this explicit language as to the developer, paragraph 14 of the plat restrictions gave LJE authority to enforce the restrictive covenants because it states that the "breach of any of the foregoing conditions shall constitute a cause of action against the person committing the breach by [LJE] or [the developer]." CP at 133.

¶17 Further, the developer itself incorporated LJE and stated that LJE's purposes included "the improvement and development" of the subdivision and to "keep records of building permits and/or other approvals or disapprovals made or issued by [LJE]." Ex. 58, Art. II, nn.1, 8. Jensen encourages us to read restriction 6 as inapplicable and unenforceable now because Lake Tapps Development Company, the developer, no longer exists. LJE counters that such a narrow reading ignores the developer's intent, which was to ensure that LJE had an active role in enforcing the covenants, including the power to approve or deny subdivision requests.

¶18 Jensen is correct that the developer explicitly referenced in restriction 6 no longer exists and that no other restriction explicitly grants LJE authority to approve subdivision requests. Such a reading, however, runs counter to Washington's analytical framework when it comes to interpreting restrictive covenants. *See Green*, 137 Wn. App. at 683-84. The developer's overarching intent is clear: no lot shall be subdivided without written consent. LJE, like the homeowners association in *Sherwood*, has long existed and engaged in a wide array of enforcement duties relative to the neighborhood and is the most suitable venue for such approvals since the developer dissolved in 2003. In light of Washington's less restrictive approach to interpreting restrictive covenants, which encourages interpretations that protect the homeowners' collective interests, Jensen's argument fails.

B. *Authority as De Facto Successor*

¶19 Alternatively, Jensen argues that the trial court's conclusion that LJE was the de facto successor to the developer and had authority to require lot owners to obtain LJE's approval before subdividing any lot was in error. As we recognized in our prior *Jensen* decision, whether LJE is a de facto successor is a factual question. 2008 WL 2026096, at *3, 2008 Wash. App. LEXIS 1126, at *6-7. Jensen did not assign error to the findings of fact that support the trial court's conclusion; therefore review is limited to whether the findings support the conclusions of law. *Standing Rock*, 106 Wn. App. at 242-43. Unchallenged findings of fact are verities on appeal. *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004); RAP 10.3(g). Among the unchallenged findings are the facts that (1) the developer granted LJE the power to enforce the covenants, including the covenant requiring approval for subdividing lots; (2) LJE's purpose was to maintain the development and preserve its value; (3) the developer had an interest in forming LJE to provide regulation to preserve the neighborhood's character; (4) LJE received and responded to requests to subdivide lots as early as 1973; (5) the city referred two landowners seeking subdivision approval to LJE in 1990; (6) at least six lot owners submitted their requests to subdivide their lots to LJE between 2001 and 2005 and LJE ruled on those requests; and (7) LJE successfully sued to uphold its right to enforce the covenant on subdivision in 2000.[3] Because these unchallenged findings are verities on appeal and support the trial court's conclusion of law 5, LJE is a de facto successor to the developer. *Jones*, 152 Wn.2d at 8. Thus, Jensen's argument here fails.

¶20 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

---

[3] Findings of Fact 4, 5, 7, 8, 9, 10.

shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.[4]

ARMSTRONG and QUINN-BRINTNALL, JJ., concur.

---

[4] In the unpublished portion of this opinion, we reject Jensen's contention that LJE acted unreasonably and in bad faith. We also reject Jensen's contention that the trial court abused its discretion when it admitted the informal membership poll.