IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DALE CAREY and CONNIE CAREY, husband and wife and their marital community, SUMMIT FINANCIAL, INC., a Washington for-profit corporation, | ) ) ) ) ) | No. 77768-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |
| Appellants, | ) ) | |
| v. | ) ) | |
| MATTHEW BUMSTEAD and KRISTIE BUMSTEAD, husband and wife and their marital community, CLARITY CAPITAL MANAGEMENT CORPORATION, a Washington for-profit corporation, | ) ) ) ) ) ) ) | |
| Respondents. | ) ) ) | FILED: April 29, 2019 |

ANDRUS, J. — Dale Carey appeals an adverse judgment entered in favor of his former business associate, Matthew Bumstead. Carey and Bumstead formed Summit Financial, Inc. (SFI), which they ran together until the end of 2015. Carey sued Bumstead, seeking a portion of commissions Bumstead received after leaving SFI. The trial court concluded Carey and Bumstead had no agreement to share commissions after they ended their business relationship. We affirm.

## FACTS

In December 2008, Carey and Bumstead, both licensed stockbrokers, decided to leave their employer and form their own financial services firm. The

men executed an "Agreement of Purchase," (Written Agreement), under which Bumstead agreed to pay Carey $400,000 to acquire one half of "override" revenues to which Carey was entitled on broker accounts he supervised, and one half of commissions paid on "orphan" accounts—accounts Carey managed after the initiating brokers left the firm.

In addition, Carey and Bumstead agreed they would form an entity, either a corporation or a limited liability company, for the purposes of reducing personal liability, providing a "doing business as" name for the men, providing a means to house equipment and supplies, and allowing for easy bookkeeping and splitting of business related expenses. The men agreed to split ownership of this entity 50/50. Bumstead also agreed he would obtain a Series 24 license to help Carey, who already held a Series 24 license, with any supervisory duties. But they agreed Bumstead would continue to receive the "maximum payout on his personal book of business." Both men testified that under the Written Agreement, they each retained the right to receive 100 percent of commissions from their own personal sales.

Carey and Bumstead created SFI, a "Sub S" corporation,[1] which they operated in association with the broker-dealer INVEST Financial Corporation. When they began their association with INVEST, Carey obtained a $477,512 broker-dealer transition loan[2] through INVEST. Carey and Bumstead used the

---

[1] An "S" corporation is a corporation that elects to pass corporate income, losses, deductions, and credits through to their shareholders for federal tax purposes. https://www.irs.gov/businesses/small-businesses-self-employed/s-corporations.

[2] When a financial advisor transitions from one broker-dealer to another broker-dealer, he or she must ask each client to sign paperwork to move the account. A transition loan is used to ease transition from one broker-dealer to another broker-dealer while waiting for accounts to move

loan to cover corporate expenses and some salaries for staff they hired during the transition, and they then split equally the excess proceeds from this loan. Under their arrangement with INVEST, if they hit certain annual revenue goals, INVEST forgave a portion of the loan each year.

Two months later, they reached a separate oral agreement (Oral Agreement). At trial, Carey and Bumstead disputed the terms of that agreement and its effect on the Written Agreement. Carey maintained they agreed that Bumstead would forgo obtaining the Series 24 license and focus on marketing the corporation. In exchange, they would become equal partners in all aspects of the business, including sharing equally all commissions on personal production. Carey testified the men decided to split personal production commissions because this new arrangement meant more supervisory work for him.

Carey further testified that if a new client purchased an insurance policy or engaged in any stock trade during the course of what he called the "partnership," then any revenue from that client's business activities at any point thereafter belonged to the partnership, and he was entitled to 50 percent of that revenue no matter when received. Carey also testified the parties executed new Registered Representative Commission Schedules,[3] instructing INVEST to divide all commissions equally, regardless of who wrote the business.

---

over. INVEST loaned funds to Carey personally because it was prohibited by Securities and Exchange Commission (SEC) regulations from loaning money to SFI.

[3] These are forms INVEST uses for representatives to instruct the company on how to divide commissions.

Bumstead testified he agreed to pool his personal production revenue to pay corporate expenses and to split any residual funds. He conceded they agreed to split commissions 50/50, but testified they never discussed and thus had no agreement to split client revenues after they ended their relationship. He characterized the commission splitting as a way to ensure neither man focused solely on personal production while neglecting the other employees, the managerial tasks, and the override accounts. Bumstead testified he elected to forgo the Series 24 license because it provided little benefit to SFI or to him, and there were other, more effective ways, he could help Carey with managerial-type tasks, such as recruiting and training new advisors.

According to Bumstead, when he signed the Registered Representative Commission Schedules with INVEST, he did not consider it a contract to split commissions with Carey in perpetuity. He understood the commission revenue split to be a method of making tax reporting easier because each man's IRS form 1099 from INVEST would be equal to the other's. He testified the revenue split could be modified with INVEST at any time.

Beginning in 2011, Bumstead expressed dissatisfaction with the discrepancies between his and Carey's personal production. When the men started their association, each man's book of business was relatively the same size. As time went on, Bumstead became more successful, and Carey stated they "were receiving a lot of [recurring] revenue from clients that [Bumstead] had started writing." Carey testified, however, that because he was the only one performing supervisory duties, it was difficult for him to find time to grow his book of business.

- 4 -

On October 4, 2015, Bumstead sent an email to Carey proposing a change to the commission split. Bumstead, whose 2014 production had quadrupled Carey's, felt he was living paycheck to paycheck, despite producing $600,000 per year. He felt an unfair share of his commissions was going to Carey. Bumstead proposed splitting commissions 50/50 on the first $200,000 of revenue each generated, instituting a 75/25 split on the next $200,000 in revenue, and then allowing each party to retain 100 percent of any revenue in excess of $400,000. He proposed to continue splitting all override commissions and business expenses.

Carey testified Bumstead's email essentially ended their working relationship. According to Carey, he was not going to change from a 50/50 arrangement to what he characterized as Bumstead's "breadcrumbs" offer.

Bumstead and Carey continued with business as usual, including splitting the bills through the end of 2015, at which point they hoped to have everything settled to allow each to go his separate way. Carey testified they agreed on how to distribute SFI assets but felt they had to settle how to divide future revenue streams from clients he deemed to belong to the "partnership." Bumstead did not believe he owed any future revenue stream to Carey. Moreover, he wanted to be repaid for the $400,000 he had paid Carey to buy into the business.

Gary Richardson, a supervising broker with INVEST, tried to help the men to resolve their differences. Richardson convinced Bumstead to compromise on the issue of future revenue sharing if they could find a compromise on the buy-out of his interest in SFI. He proposed that Bumstead and Carey create a new "rep

- 5 -

code" account, known as the 7JG account, into which INVEST would deposit commission revenue from certain accounts identified by Bumstead. Carey testified the parties reached an enforceable agreement under which Bumstead agreed to pay him commissions of $97,000 a year for some unidentified period of time. Carey admitted he never signed an agreement documenting these terms.

Bumstead testified the parties never reached a settlement agreement. While acknowledging displeasure with funding the 7JG account with commissions he believed belonged to him, he was willing to agree to the deal if Carey agreed to repay him the amount he paid Carey in 2008 to buy the override and orphan account revenue stream.

Carey then sent an email to Richardson raising new demands. Bumstead and Richardson testified that when Richardson broached the buy-out subject with Carey, Carey stopped communicating with him. At this stage, Bumstead walked away from further negotiations and indicated he would not authorize the creation of or depositing of revenues into the 7JG account.

By this time, however, Richardson had already put steps into place to create the 7JG account within INVEST. Before Richardson could put a hold on payment by INVEST, the company manually removed commissions owed to Bumstead and applied the funds to the 7JG account, which Carey then received. Both Bumstead and Richardson testified the 7JG account should not have been funded because Bumstead and Carey never finalized a settlement agreement.

The trial court found that the Written Agreement contained no terms governing the end of the business relationship. It found that although the men did

not initially agree to contribute and share their revenue streams from their personal production, they subsequently entered into the Oral Agreement to do so. However, the trial court further found the men never transferred the ownership of their respective clients, client relationships, or accounts to each other or to SFI. The trial court concluded the revenue from each man's personal production remained the personal property of each party. It further concluded the parties were legally precluded from transferring ownership of their personal production to each other under Securities and Exchange Commission (SEC) regulations and their individual contracts with INVEST. It denied Carey's claim to any revenue stream from Bumstead's personal production going forward.

Furthermore, the court found that while the men engaged in negotiations prior to and after December 31, 2015, to formulate the terms of Bumstead's exit from SFI, the men did not reach an actual settlement agreement. It denied Carey's claim that Bumstead breached any settlement agreement by failing to deposit commissions into the 7JG account.

Moreover, because no settlement agreement was reached, the court found that 7JG was prematurely funded and that the money deposited into that account in January 2016 actually belonged to Bumstead. It concluded Carey owed Bumstead $18,967 that Carey retained from that account.

The court found the parties also agreed that commissions from life insurance policies would be shared. It found that Bumstead retained a $79,454 commission in 2011 but concluded that Carey knew about this action and any claim to any share of this commission was barred by the statute of limitations. It also

- 7 -

found Bumstead retained a life insurance commission of $8,230 in 2012 and a life insurance commission of $2,636 in 2013, both without Carey's knowledge. It concluded Carey was owed 50 percent of these commissions, totaling $5,433.

The trial court entered a net judgment for $17,534.30[4] in favor of Bumstead. Carey appeals.

## ANALYSIS

### A. Standard of Review

Carey challenges most of the trial court's findings and legal conclusions. When we evaluate evidence from a bench trial, our review is limited to determining whether substantial evidence supports the challenged findings and whether the findings support the conclusions of law. Jensen v. Lake Jane Estates, 165 Wn. App. 100, 104, 267 P.3d 435 (2011). Substantial evidence is evidence sufficient to persuade a rational, fair-minded person of the truth of the premise. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We review all reasonable inferences in the light most favorable to the prevailing party, in this case, Bumstead. Jensen, 165 Wn. App. at 104. This court does not weigh the evidence or substitute its opinions for those of the trial court. Id. at 105. We accept the few findings that Carey does not challenge as true on appeal. Id. Questions of law and conclusions of law are reviewed de novo. Sunnyside Valley, 149 Wn.2d at 880.

---

[4] This number included a $4,000 sanction against Carey for late disclosure of expert witness testimony.

B. Existence of Partnership

Carey argues the trial court erred by not finding that he and Bumstead were partners. Whether a partnership exists is a question of fact. Latham v. Hennessey, 13 Wn. App. 518, 521-22, 535 P.2d 838 (1975); aff'd, 87 Wn.2d 550, 554 P.2d 1057 (1976); abrogated on other grounds, In re the Marriage of Lindsey, 101 Wn.2d 299, 678 P.2d 328 (1984); see also Goeres v. Ortquist, 34 Wn. App. 19, 22, 658 P.2d 1277 (1983). This court does not substitute its judgment for that of the trial court in resolving factual disputes, Thorndike v. Hesperian Orchards, Inc., 54 Wn.2d 570, 574-75, 343 P.2d 183 (1959), and we will not set aside the trial court's findings unless we conclude they are contrary to the preponderance of the evidence. Curley Elec., Inc. v. Bills, 130 Wn. App. 114, 121, 121 P.3d 106 (2005).

The trial court did not enter a written finding of fact as to whether a partnership existed. If no findings are entered as to a material fact, it is deemed to have been found against the party having the burden of proof. Pacesetter Real Estate, Inc. v. Fasules, 53 Wn. App. 463, 475, 767 P.2d 961 (1989). Carey, as the party alleging the existence of a partnership, bore the burden of proving that he and Bumstead were partners. Curley, 130 Wn. App. at 120-21. We thus assume the trial court found against Carey on this factual issue.

This presumption is supported by the trial court's conclusion on Bumstead's motion for directed verdict:

> I'm really struggling with the use of the word partnership because there was never a partnership here. There was a subchapter S

corporation but there was never a legal partnership. There's not an LLC; there's not a formal creation of a legal entity that is a partnership. There are contracts between these two individuals. There's a subchapter S corporation which is the vehicle and it's how it's described in the original written contract.

The trial court's oral finding is consistent with Washington's Revised Uniform Partnership Act, chapter 25.05 RCW. Under RCW 25.05.055(1), a partnership is "[t]he association of two or more persons to carry on as co-owners a business for profit . . . , whether or not the persons intended to form a partnership," except as set out in subsection (2). Subsection (2) provides that "[a]n association formed under a statute other than this chapter . . . is not a partnership under this chapter." RCW 25.05.055(2).

The evidence at trial established Bumstead and Carey chose to form a corporation, rather than a partnership, to carry out their investment business. Carey testified he and Bumstead formed SFI as a corporation. The certificate of incorporation with the Secretary of State identified the date of incorporation as January 20, 2009, a date that corresponds to the formation of their business relationship. Carey also testified the parties owned this corporation in equal shares.

According to SFI's accountant, Jerry Gintz, he prepared Sub S corporate tax returns for SFI for each year the business was in existence. He testified SFI paid each owner W-2 wages, and then paid them distributions over and above those wages after payment of corporate expenses. Gintz confirmed that any commissions paid to Carey or Bumstead individually were "assigned" by them to

- 10 -

SFI and used to pay staff salaries and other business expenses, and then shared equally at the end of each tax year.

Corporations are formed under the Washington Business Corporation Act, chapter 23B RCW, not under the Revised Uniform Partnership Act. There is more than ample evidence to show that the parties chose to form their business as a corporation and not as a partnership governed by chapter 25.05 RCW. Thus, under RCW 25.05.055(2), the business relationship did not constitute a partnership.

Carey argues that although he and Bumstead formed SFI as a corporation, SFI was only a vehicle for paying joint expenses and did not replace their partnership. The trial court did not find this argument persuasive, and there is substantial evidence to support a contrary finding. When INVEST paid commissions to Carey and Bumstead, they received these funds in personal bank accounts, and they then transferred money into a corporate bank account to cover salaries and other expenses. There is no evidence the parties opened any bank account in the name of a partnership. There is no evidence they obtained a business license to operate a partnership. The parties were deemed employees of and paid through the corporation. They filed corporate tax returns, not partnership returns. Other employees who earned commissions assigned those commissions to SFI, and SFI then issued these employees W-2 wages.

Carey points to the fact the parties called their association a partnership. But that usage by itself does not establish that a partnership existed. See State v. Bartley, 18 Wn.2d 477, 481, 139 P.2d 638 (1943) ("The fact that the parties to a

business arrangement may call it a partnership does not make it such."). It is clear that the trial court construed the parties' use of the term as a lay descriptor and not as a legally defined entity.

We conclude substantial evidence supports the trial court's finding that Carey and Bumstead did not form a partnership.

C. Carey's Entitlement to Bumstead's Commission Revenue

Carey contends the trial court erred in concluding he is not entitled to 50 percent of commissions Bumstead receives from clients procured during the business relationship. He argues the commission revenues are "partnership property" to which he has a legal entitlement.

The trial court found that "[a]t no point did the parties transfer the ownership of the clients, client relationships, or accounts that they managed to each other or to SFI." Based on this finding, the trial court concluded that "[t]he revenue from personal production of each party, is, was, and remains the personal property of each [p]arty." The evidence at trial supports the trial court's finding and the finding supports its legal conclusion.

First, given the trial court found the parties did not form a partnership, it logically follows the commission revenue stream could not be partnership property.

Second, under the Revised Uniform Partnership Act, property is "partnership property" if acquired in the name of the partnership or by one of the partners with an indication of the person's capacity as a partner or of the existence of the partnership. RCW 25.05.065(1). Property acquired in the name of one of the partners, "without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership

and without use of partnership assets, is presumed to be separate property, even if used for partnership purposes." RCW 25.05.065(4).

There was no evidence that Carey or Bumstead acquired clients or client accounts or commissions in the name of a partnership. Bumstead testified that when he wrote business for a new client while affiliated with SFI, the client signed an agreement with him as the registered representative of INVEST, not with SFI. Richardson testified that the writing representative, the person who meets the client and signs the application, is the owner of the business. In addition, Shane Copeland, a relationship manager for independent representatives with INVEST, testified that the registered representative to whom the commissions are paid owns those commissions. Because the accounts were not acquired in the name of the purported partnership or of SFI, the accounts are presumed to be the parties' separate property.

Carey contends the parties' course of dealing in sharing commissions over a period of five years supports the existence of an agreement to continue sharing this revenue stream. A course of dealing is a "sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Puget Sound Fin. v. Unisearch, Inc., 146 Wn.2d 428, 436, 47 P.3d 940 (2002) (quoting Restatement (Second) of Contracts § 223 (Am. Law Inst. 1981)). Courts may be guided by course of dealing to supply an omitted contract term. Id.

Here, the trial court considered the parties' course of dealing and determined it did not establish any agreement to share revenues after their

business agreements were terminated. Substantial evidence supports this finding. Bumstead testified the Oral Agreement provided that they would share personal production only during their professional association. Carey admitted that neither the INVEST commission splitting schedule he and Bumstead signed nor the Written Agreement specified when commission sharing would end. There was no testimony that the parties agreed to share revenues after the relationship ended. The evidence, at most, demonstrated the parties agreed to share revenue during the term of their Written and Oral Agreements. The course of dealing evidence does not indicate any agreement regarding revenue sharing once those agreements were terminated.

Next, Carey maintains the parties entered into an enforceable settlement agreement to share commissions from those accounts Bumstead designated for the 7JG account. The trial court found otherwise, and substantial evidence supports that finding.

"The validity and enforceability of a settlement agreement are determined by reference to the substantive law of contracts." Veith v. Xterra Wetsuits, L.L.C., 144 Wn. App. 362, 366, 183 P.3d 334 (2008); see also Pietz v. Indermuehle, 89 Wn. App. 503, 519, 949 P.2d 449 (1998). A contract requires offer, acceptance, and consideration. Veith, 144 Wn. App. at 366. A party who has the duty to establish the existence of a settlement agreement must produce evidence showing these three requirements. Id. at 367. Where material terms of a proposed settlement are not resolved, the party fails to establish that a settlement agreement existed. Id. at 363, 367.

- 14 -

Richardson testified that Carey and Bumstead never reached a deal on the terms of Bumstead's exit from SFI. He also testified that there was never an agreement between the men over how long the 7JG account would be funded. According to Richardson, while Carey was willing to discuss terms relating to the 7JG account, Carey refused to discuss Bumstead's request that he buy out Bumstead's interest in SFI. Bumstead similarly testified the parties did not finalize any settlement agreement. Carey admitted there were unresolved issues between the men.

The trial court found that despite negotiations, no actual settlement agreement was reached. Because the evidence supports a finding that material terms of the proposed settlement agreement were unresolved, the court's conclusion that no enforceable settlement was reached is supported by substantial evidence.

The evidence supports the trial court's determination that Carey had no entitlement to a portion of Bumstead's commission revenue after the termination of their Written and Oral Agreements.

D. SEC Regulations

Carey also challenges the trial court's conclusion that SEC regulations preclude transferring an ownership interest in commissions to a party other than the individual broker who earned them. We review this conclusion of law de novo. Sunnyside Valley, 149 Wn.2d at 880.

The Financial Industry Regulatory Authority (FINRA) Rule 2040 provides that:

> No member or associated person shall, directly or indirectly, pay any compensation, fees, concessions, discounts, commissions or other allowances to: (1) any person that is not registered as a broker-dealer under Section 15(a) of the Exchange Act but, by reason of receipt of any such payments and the activities related thereto, is required to be so registered under applicable federal securities laws and [Securities and Exchange Act (SEA)] rules and regulations; or (2) any appropriately registered associated person unless such payment complies with all applicable federal securities laws, FINRA rules and SEA rules and regulations.

The SEC has repeatedly taken the position that FINRA Rule 2040 precludes licensed stockbrokers from assigning their right to receive commissions to an unregistered business entity. For example, in Wolff Juall Investments, LLC, SEC No-Action Letter, 2005 WL 5394659 (May 17, 2005), the SEC found that transferring commissions to a limited liability company so the company could pay salaries to registered representatives and staff violated FINRA Rule 2040. Similarly, in Herbruck, Alder & Co., SEC No-Action Letter, 2002 WL 1290291 (June 4, 2002), the SEC stated a company could not pool commission checks to pay business expenses and then reissue commissions to the employee who produced the business. See also Birchtree Fin. Svcs, Inc., SEC No-Action Letter, 1998 WL 652151 (Sept. 22, 1998) (declining to grant no-action relief to the practice of routing commissions or other transaction-related compensation directly from a broker-dealer to an unregistered entity established and controlled by the broker-dealer's registered representatives).

Courts are not bound by the determinations made in SEC no-action letters, and the letters do not carry any precedential value. Apache Corp. v. Chevedden, 696 F. Supp. 2d 723, 735 (S.D. Tex. 2010). Nevertheless, regulatory interpretations in these letters may "enlighten a court struggling with ambiguous

provisions in federal securities statutes or [SEC] rules." Id. (quoting Donna M. Nagy, Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters: Current Problems and a Proposed Framework, 83 CORNELL L. REV. 921, 996 (1998)). Thus, we consider the SEC no-action letters as persuasive authority. Id.; see also Gryl ex rel. Shire Pharm. Grp. PLC v. Shire Pharm. Grp. PLC, 298 F.3d 136, 145 (2d Cir. 2002).

Based on these SEC no-action letters, it is highly likely the legal structure Bumstead and Carey created—assigning commissions to SFI to cover expenses and then having SFI pay any residual funds back to them—violated FINRA Rule 2040.

The evidence presented at trial further supports this conclusion. Copeland testified that INVEST cannot make payments to non-registered persons or entities, such as SFI, and must instead pay commissions directly to the registered representative. Gintz similarly testified that INVEST was required by industry rule to pay the person who earned the commission directly and that a registered broker could not assign his commissions to an unregistered entity. Carey agreed that SEC regulations prohibited payment of securities commissions to SFI.

Carey admitted at trial that an INVEST compliance officer sent him an e-mail in 2016, informing him that it "is absolutely forbidden for an [Office of Supervisory Jurisdiction[5]] manager or rep to have all commissions paid to him or her and they then turn those commissions over to an entity that pays commissions out to staff."

---

[5] This is an "office where at least one on-site supervisor works who is properly licensed and able to approve accounts, approve advertising, execute orders, be a custodian of customer funds/securities, and/or review customer orders."

INVEST attached an SEC no-action letter detailing a prohibited business model closely mirroring the one previously set up by Carey and Bumstead. INVEST recommended Carey consult legal counsel because of the risk of a FINRA rule violation. After receiving this email, Carey stopped assigning commissions to SFI and entered into a "service agreement" with the corporation, under which he paid the corporation for administrative services it provided to him. Thus, had Carey and Bumstead continued working together, they would have had to change their business structure to meet INVEST's interpretation of the FINRA requirements.

The SEC no-action letters coupled with the evidence presented at trial support the trial court's conclusion that the parties were legally precluded from transferring ownership of their personal production commissions to each other or to SFI.

### E. 2011 Insurance Commission

Lastly, Carey challenges the trial court's determination that his claim to a portion of a 2011 life insurance commission Bumstead received was time-barred. Whether a claim is time barred is a question of law we review de novo. Pietz, 89 Wn. App. at 511.

The statute of limitations for an oral agreement is three years, RCW 4.16.080(3), while that for a written agreement is six years, RCW 4.16.040(1). Because the parties did not agree to begin revenue sharing until they entered into the Oral Agreement, the three year statute of limitations applies to this claim.

Bumstead wrote a life insurance policy for Bumstead's father in August 2011. Carey testified Bumstead refused to share the $80,000 commission

with him when the policy was sold.  Carey's cause of action for any portion of these funds accrued in 2011 when he learned Bumstead had received the commission and had refused to transfer it into SFI.  See Pietz, 89 Wn. App. at 511.  Carey did not seek relief until 2016, almost five years later.  This evidence supports the trial court's conclusion that the statute of limitations barred Carey's recovery of any portion of the 2011 insurance commissions.

Affirmed.


WE CONCUR:

Andrus, J.

Chun, J.

Leach, J.